## Samuel S. McClure, Appellant, v. Times Publishing Company.

*Referee—Effect of finding.*

The finding of facts by a referee cannot be reversed on appeal if the evidence fairly warranted it, even though there may be room for disagreement as to the correctness of his conclusions.

*Contract—Implied acceptance—Estoppel.*

Plaintiff offered defendant's manager to supply it with certain writings of certain authors for publication for a year in weekly installments on certain terms ; the manager declined to make a contract for a year, but offered to contract on other terms suggested by him. The parties separated without agreement. Subsequently, defendant published in its newspaper an announcement that certain authors named (nearly all of whom were those whose writings were embraced in plaintiff's offer and with whom defendant had no contracts) would contribute to its pages during the ensuing year. *Held,* that such publication did not in law constitute an acceptance of plaintiff's proposal, but was, at most, an item of evidence to be considered in determining that question. *Held further,* that such publication would not operate as an estoppel so as to prevent defendant from showing that plaintiff's offer was not accepted.

Argued Jan. 28, 1895. Appeal, No. 165, July. T., 1894, by plaintiff, from judgment of C. P. No. 4, Phila. Co., March T., 1890, No. 216, dismissing the exceptions to and confirming the report of Hampton L. Carson, Esq., to whom the case had been referred as referee under act of May 14, 1874, P. L. 166. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Assumpsit for breach of contract.

The case was referred, under the act of 1874, to Hampton L. Carson, Esq., as referee, who reported as follows :

"The plaintiff, Samuel S. McClure, is the proprietor of a literary bureau for furnishing matter for publication to the various newspapers, magazines and journals in this country, said matter being purchased by him from authors of distinction, both in this country and in Europe, and in turn sold to American journals. He brings this action of assumpsit to recover a balance which he insists to be due under the terms of an alleged contract entered into between him and the defendant company.

"In the statement of claim, after setting forth the character of his business, he alleges that on the 31st of August, 1889, he propounded to Frank McLaughlin, president of The Times Publishing Company, certain terms embodied in a letter accompanying a prospectus, a copy of which was attached to said statement and made a part thereof. According to this offer, he agreed to furnish to the defendant for a period of one year from Sept. 22, 1889, literary articles from the pens of different authors whose names were printed in the said prospectus, at the rate of $100 per week, payable weekly ; the matter furnished to contain on an average 10,000 words weekly. He also alleged that thereafter, and prior to September 29, 1889, the defendant accepted the offer as contained in his letter, and agreed with him to accept for one year from Sept. 29, 1889, at the rate of $100 per week, payable weekly, such articles from any of the authors named in the said prospectus as might be furnished by the plaintiff, and thereupon he did furnish to the defendant each and every week the matter called for. He alleged that the defendant, in disregard of its promise and undertaking, had not complied with its agreement, but had refused on and after the 23d of December, 1889, to pay the plaintiff for different

articles furnished to it after said date, and notified the plaintiff that it did not recognize the contract, and that it would not accept or pay for any further literary articles that might thereafter be furnished. The plaintiff further alleged that he was under contract with the authors whose names were printed in the prospectus, and others, by which he was bound to accept from them, and compensate them for the different literary articles which he had before agreed to furnish to the defendant, and that he was and would be unable to sell and dispose of the right to publish the matter which, by the terms of the contract, he had agreed to furnish to the defendant. He therefore alleged damage in the sum of $3,900, to recover which said suit was brought.

"The affidavit of defense filed in behalf of The Times Publishing Company, while admitting the terms of the offer made as stated by the plaintiff, denied specifically that said offer had been accepted, and alleged an agreement to allow the plaintiff to send to the defendant certain matter, which it was represented would be illustrated in a certain way and would be the work of certain authors who were named, upon the special understanding that the defendant was not to be bound in any way to accept said matter for any specific length of time, and that the service could be discontinued at any moment at the pleasure of the defendant. That under this agreement the defendant received from the plaintiff said literary matter for several weeks, when the defendant was notified that no more matter would be accepted from him, and that he should thereupon cease to send it; that for the amount of matter furnished by the plaintiff to the defendant full payment had been made, and that since the notification by the defendant to the plaintiff of the exercise of its option to terminate the contract no matter had ever been used or accepted; and said affidavit closed with a denial of the indebtedness of the defendant to the plaintiff in any sum whatever.

The question raised by these pleadings is one of fact. Was there a contract? Did the minds of the parties ever meet? If so, upon what terms? Reviewing the testimony, it is clear that, up to a certain point, there is no conflict. It is conceded that on the 31st of August, 1889, the plaintiff wrote a letter dated the 31st of August, 1889, addressed to Frank McLaugh-

lin, publisher of The Times, in which he inclosed a prospectus for the Youths' Department, stating that everything announced on pages 3 to 11 inclusive belonged to that department; that the department would begin on September 22d, and be furnished for one year at the cost of $100 a week, the money to be paid weekly on the usual pay-day; the matter was not to be sold in New Jersey, Maryland or Washington, nor nearer Philadelphia than Pittsburg. The department was to consist of all the features announced in the year 1889, and such other features as might be deemed from time to time suitable, and to contain on an average ten thousand words weekly. The prospectus which accompanied this letter was identical in its terms with the prospectus attached to the statement filed.

" On the 1st of Sept., 1889, Mr. McLaughlin replied by letter announcing that he would see the plaintiff on the following Tuesday in relation to securing some of his literary service. This correspondence was followed by an interview which took place in New York city, at which no definite understanding was reached, and was followed by a visit of the plaintiff to the office of Mr. McLaughlin, the defendant's manager, in the city of Philadelphia, at which a long conversation took place, in which the terms of both parties were discussed at large; the plaintiff insisting upon the terms of his offer contained in the letter of Aug. 31, 1889, and stating his absolute unwillingness to furnish the matter mentioned in said prospectus for a less period than one year at the rate of $100 per week, and Mr. McLaughlin being equally firm in his refusal to accept said matter for any specific length of time. According to the testimony of the plaintiff, corroborated by the testimony of Mr. McLaughlin upon cross-examination, the interview resulted in nothing, and both parties separated, without having reached any definite conclusion. The story of the plaintiff is, that he went West immediately after this interview, which took place in the early part of September (probably during the first week), and after an absence of from nine to thirteen days returned to Philadelphia, and in consequence of what had been told him by Charles Emory Smith, Esq., the editor of The Press, he purchased a copy of The Times, published in Philadelphia upon Saturday morning, Sept. 14, 1889, in which he perceived an announcement for the Sunday edition of the coming season, that prominent writers

had been engaged to contribute stories to The Times during 1889 and 1890, followed by a publication of their names in such a manner and by such designation as to lead him to believe that they were all taken from his prospectus, and that The Times had concluded to accept the terms of his offer, which had remained unchanged by any agreement or modification upon his part prior to his parting with Mr. McLaughlin; that he immediately called upon Mr. McLaughlin, on the 16th of September, 1889, and said to him, 'I see that you have taken it,' and received in reply the answer, 'Yes.' The story of the defendant, on the other hand, consists of a denial of the interview subsequent to the publication of the announcement in the columns of The Times of Sept. 14, 1889, and of the further and most material conversation taking place between Mr. McLaughlin of The Times and the plaintiff, in the presence of Mr. Waggener, the editor of the Youth's Department of the defendant newspaper, at the interview just prior to the plaintiff's going West, and, therefore, prior to the publication in The Times of Sept. 14, 1889. The substance of that conversation—as detailed by Mr. McLaughlin and as confirmed by Mr. Waggener—is, that so far from the parties not having come to an agreement, and separating without a definite understanding, there was a yielding on the part of the plaintiff, and an agreement by the defendant, should the plaintiff see fit to furnish the matter, to take the matter so furnished for such period of time as should prove satisfactory to the defendant; and inasmuch as the plaintiff was hard pressed for money, that the sum of $500 should be advanced to him, as The Times would take matter for five weeks anyhow. Subsequently, matter was furnished, presumably on this basis.

" It will be seen, therefore, from this radical difference in the testimony of the various parties, that two distinct agreements are alleged to have been made—the plaintiff insisting that the publication, in the issue of Sept. 14, 1889, of all the essential and conspicuous features contained in his prospectus, which had been furnished on the basis of the offer contained in the letter of Aug. 31, 1889, constituted a distinct acceptance by the defendant of the terms contained in that letter, inasmuch as the offer had never been modified or withdrawn, but that the parties had simply separated without coming to any distinct

agreement, the plaintiff insisting upon the terms of his offer, and that the act of publication by the defendant making the announcement as stated, imposed upon the defendant a contractual obligation to accept matter for the period of one year from the 22d of September, 1889, at the rate of $100 per week, settlements to be made weekly.

" The defendant, on the other hand, alleged a totally distinct contract, viz: That before its publication in the issue of Sept. 14, 1889, and before the interview immediately preceding the plaintiff's trip to the West had terminated, the parties had come to a distinct understanding that should matter be furnished by the plaintiff it must be for such length of time as the defendant saw fit to accept it; that inasmuch as the plaintiff was needy the sum of $500 should be advanced to him, as they would undoubtedly take the matter five weeks at least.

" The issue as thus stated is one of fact, and turns upon the preponderance of proof. It is not a question as to whether the minds of the parties met at any time. But, conceding that they did meet, upon what terms did they meet? Did the defendant accept the plaintiff's terms, or did the plaintiff accept the defendant's terms? Inasmuch as the contract alleged by the defendant to have been made precedes in its order and date the contract alleged by the plaintiff to have been made, we will first deal with the contention of the defendant.

" It is to be observed that the direct testimony in support of this position of the defendant is to be found in the testimony in chief of Mr. McLaughlin and of Mr. Waggener. This testimony is direct and specific as to the request of the plaintiff for an advance of $500, and the agreement by the defendant to pay it, inasmuch as they would take the matter to be supplied by the plaintiff for five weeks anyhow; and it is also distinct and specific upon the point that if the plaintiff sent any matter to the defendant for publication it would be upon the defendant's terms, and not upon the plaintiff's. This statement is, in part, corroborated by the written statement of Col. A. K. McClure, which was accepted by counsel in lieu of his sworn testimony, to the effect that the plaintiff was informed by both McLaughlin and Col. McClure that under no circumstances would a contract be made for the publication of the plaintiff's articles for a year, or a contract entered into to publish them at

any time that they might not be satisfactory. It is to be observed, however, that Col. McClure in no way refers to the special features of the contract based upon the advance to the plaintiff of $500, which is specifically mentioned by Mr. McLaughlin and Mr. Waggener; so that upon this branch of the case Col. McClure's testimony is of no avail, except so far as to corroborate the statement acquiesced in by the plaintiff himself, that The Times Publishing Company at no time was willing to make a definite contract with the plaintiff at any interview held between him and the officers of the defendant company for a specific length of time, as a definite charge per week.

" Was there, in point of fact, such a contract made between the plaintiff and the defendant as is contended for by the defendant? This brings the referee to a consideration of the remaining testimony in the cause.

" It is to be observed, in the first place, in the plaintiff's testimony in chief, when describing the interview between McLaughlin and himself in the presence of Mr. Waggener, that no reference at all is made by him to the terms of any special agreement based upon the advance to him by the defendant of the sum of $500. He states with great clearness that at that interview both stood distinctly upon their own positions, refusing to yield one inch to each other; that while he refused to part with his matter, or any portion of it for less than a distinct period of time, at a distinct stipulated price, Mr. McLaughlin on his side was equally firm in declining to accede to the terms of the plaintiff's offer, but insisted that he should be permitted to buy only such matter as he saw fit to accept, and for such a length of time as he saw fit to prescribe. In other words, that they parted without reaching any agreement or conclusion.

" It is to be observed that the plaintiff was not cross-examined by the defendant's counsel specifically upon the features of the special contract alleged to have been entered into in consideration of the advance of $500, although he was pressed to state all that had occurred at the interview referred to in the presence of Mr. Waggener; and, after various efforts on his part to recall all that took place, he failed to make any reference at all to the matter as testified to by Mr. McLaughlin and Mr. Waggener. It is also to be observed that the plaintiff was not called by his counsel in rebuttal to specifically deny what Mr.

McClure and Mr. Waggener had testified to.  The referee cannot but regret that the plaintiff was not cross-examined upon this important point, or that he was not recalled by his counsel in rebuttal.  It has proved exceedingly embarrassing to the referee; but his study of the matter has led him to the conclusion that the testimony of the plaintiff—examination in chief and cross-examination—was in effect a contradiction of the testimony of the defendant.  His entire failure to recall any reference to the subject when pressed on cross-examination to state whether he remembered anything else other than he had stated, is in effect, in view of his oath to tell the whole truth, a statement which cannot be reconciled with that of the defendant. . . . It is to be observed in testing the accuracy of the defendant's contention, that, while the testimony of Mr. McLaughlin in chief was express and specific upon the question of the $500 consideration in support of the special contract to furnish matter only at the pleasure of the defendants, yet on cross-examination Mr. McLaughlin makes no reference to it at all. When questioned as to why the publication of the 14th of September, 1889, was permitted to be made, he does not reply, ' Because there was a special agreement reached between the plaintiff and myself prior to his going West by which I was permitted, in consideration of the advance to him of the sum of $500, to announce that I had made arrangements for the publication of articles to be furnished by the plaintiff for such length of time as might prove agreeable to me,' but he bases the justification of the publication of Sept. 14, 1889, upon the antecedent receipt of matter by him from the plaintiff, and he states the result of the interview between Mr. McClure, the plaintiff, and himself just prior to the trip to the West in such a manner as to leave both parties free to do as they pleased.  The whole pith of the matter is contained in the two last questions and answers of his cross-examination.  He was asked : ' Q. Then you printed the prospectus because he sent on the matter, and, as you had told him if he sent the matter it must be on your terms, you concluded, with nothing more, he had accepted your terms, and thereupon printed the prospectus?  A. Yes, sir.  Q. Until he had sent the matter you would not have been justified under the announcement of his intentions that he made when he parted with you to have printed it?  A. Certainly not.'

" This cross-examination, it is to be observed, makes no reference at all in the slightest degree to any special contract based upon the advance to the plaintiff of the sum of $500, but on the contrary contains a distinct admission of the correctness of the plaintiff's testimony in testifying that they parted without having reached any definite agreement at all, and it makes the whole case revolve upon the pivotal point as to whether the publication of the prospectus depended upon the receipt of matter furnished by the plaintiff. Here, therefore, is a distinct departure on the part of Mr. McLaughlin on cross-examination from the position to which he had distinctly testified in chief, and to this extent it must be considered as very materially weakening his testimony as a witness. So that we have the result of the plaintiff standing as a witness on one side, corroborated by the cross-examination of the defendant's manager, and on the other side a witness with a cross-examination at variance with his examination in chief, supported, however, by another witness, Mr. Waggener; so that the result of the analysis would be to pit one whole witness on one side against one whole witness on the other. Without something further to turn the scale in the case, there could, of course, be no conclusion in favor of the plaintiff, for it is his duty to submit a preponderance of proof, and establish his contention beyond doubt or peradventure. Is there anything else in the case to throw light upon this question? The referee turns to the correspondence between the parties, and observes closely the dates at which the various letters were written, and the language of the letters themselves, and he is convinced that Mr. McLaughlin and Mr. Waggener, while doubtless acting under the most scrupulous fidelity to their own convictions of truth, are yet seriously mistaken as to the true order of events, and that they have confounded what took place before Sept. 14, 1889, with what took place after that critical date. The important question to be answered at this point is, At what time was the matter furnished by the plaintiff to the defendant? If before the publication of Sept. 14, 1889, then McLaughlin's testimony is to be taken as corroborated beyond the reach of cavil or dispute. If after that date, then the preponderance of proof is on the side of the plaintiff, and Mr. McLaughlin is shown to have fallen into an innocent error as to dates.

" The letters of the plaintiff to the defendant of September 18th and September 19th, and the letter of the defendant's manager to the plaintiff of September 19th are conclusive upon this point. On the 18th of September, the plaintiff sent the first installment of the Youth's Department in a letter of some length, and on the 19th incloses the articles in the first installment of the Youth's Department which were not ready the day before. On the 19th of September, the defendant's manager writes that it will not be possible to set up the matter sent next week; that they are anxious to see the illustrations, and directs them to be sent along at the earliest moment. These letters show beyond controversy that the first matter sent by the plaintiff to the defendant was after the publication of September 14th and therefore could not have been made the basis of that publication. Was the advance by the defendant to the plaintiff of the sum of $500 the basis of the publication of September 14th? In discussing this question it will be observed that no proof was given by the defendant of the exact time at which this advance was to be made, and although it is referred to as having been agreed upon at the interview with the plaintiff immediately prior to his western trip, yet, inasmuch as it was not shown that it was to be an immediate advance, inuring to his benefit prior to the time when the publication was made, or that he received the money prior to that time, the question would therefore be involved in some doubt as to whether the publication of September 14th rested upon that basis, particularly in view of the discrepancies in the testimony of the various parties which have already been discussed, and need not be repeated. But all doubt upon this question is removed by the letter of the defendant addressed to the plaintiff dated Oct. 4, 1889, in reply to a letter of the plaintiff asking for advance payment for articles in this department on the ground that they had cost him a great deal of money in advance, and in which the plaintiff was criticised for poor business management on his part, and good business management on the part of the authors. . . .

" Now here it is to be observed that the letter of the plaintiff to the defendant, to which its letter of Oct. 4, 1889, is a reply, was not produced. The original of the plaintiff's letter is in the custody of the defendant, or, if lost, the plain-

tiff could have been notified to produce a copy from his letter book, or if this was not done, secondary evidence of its contents could be given. None of these courses was pursued in this case. If the plaintiff in that letter alleged as a reason why he should receive $500 in advance, that he had been put to expense in advancing money to the authors whose manuscripts he had secured, and that was deemed by the defendant to be bad business management on his part, and good business management on the part of the authors—a reason distinctly different from the terms of the special agreement contended for by the defendant as having been made prior to the publication of September 14th, at the time when the plaintiff was going West—would it not have been natural for the defendant, in answer to the letter, to have called the plaintiff's attention to the difference in the basis of the demand, and instead of acquiescing, as it undoubtedly did, in the new reason given by the plaintiff, have corrected him by stating, ' We send you check in payment of advance as especially arranged for prior to your going West,' or is it at all likely that it would have criticised as bad business management upon his part an act which it had expressly assented to ?

" The referee has very carefully considered the language of this letter of October 4th, in connection with the remaining testimony in the case, and he cannot reconcile it with any theory of special arrangements such as stated to have been agreed upon prior to the publication of September 14th. It is the defendant's own letter ; it must be taken most distinctly and strongly against the interests of the writer. It is in conflict with the special arrangement as contended for, and in this manner breaks the force of the testimony offered by the defendant, and distinctly corroborates the silence of the plaintiff in his failure to mention any such specific terms. In other words, the entire correspondence in this case from first to last is in entire harmony with the theory that the publication of the prospectus in The Times of September 14th was an acceptance of the plaintiff's terms, while the date of the receipt of the matter first sent under the agreement is also in harmony with this theory, and is still further corroborated by the letter of October 4th, in answer to one of the plaintiff's, while the defendant's manager's testimony and that of Mr. Waggener is weakened by the ad-

mission of the defendant's manager upon cross-examination, in effect stating that the parties separated without coming to terms.

" The result of the analysis of the testimony is to bring us to the point as to whether the publication by The Times on the 14th of September, 1889, of the arrangements made for the ensuing season, did or did not constitute an acceptance of the offer of the plaintiff, as contained in his letter of Aug. 31, 1889. Was it such an acceptance? Does it constitute a contract between the parties upon which an action can be sustained, sufficiently distinct and definite in its terms to support an action, and capable of being reduced to judgment for a specific amount of damages? In the judgment of the referee, such publication was an act of acceptance. What were the terms ? The offer is embodied in the letter of Aug. 31, 1889, and attached to that letter, and made a part thereof, is a prospectus printed containing the names of fifty-nine persons distinguished in literature, both in this country and abroad. It is distinctly admitted by Mr. McLaughlin that the names contained in the publication of Sept. 14, 1889, were, as to nine tenths of them, taken from the prospectus published by the plaintiff, and at that time The Times had no arrangement or contract with those authors for furnishing matter. A comparison of the prospectus with the publication in The Times of Sept. 14, 1889, reveals this fact;—that there are fifty-nine names contained in The Times' prospectus, forty-two of which are taken entirely from the prospectus furnished by the plaintiff, and the nine names which are specifically announced under the head of ' Our Boys' and Girls' Department' are all to be found in the prospectus of the plaintiff.

"The announcement in The Times is as follows: ' Among the popular writers who have been engaged to contribute stories to The Times during 1889 and 1890, may be mentioned:' and then follows a list of the authors. There are certain special features of similarity of statement, which show beyond the reach of doubt that one publication was taken from the other. In the prospectus of the plaintiff, it is said that Lord Tennyson had consented to write a poem for Mrs. Burnett's Youths' Department. ' He sent this poem in his own handwriting, an unusual occurrence, and a photo-engraving will be furnished for publication.' In the announcement made in The Times of

Sept. 14th, it is stated : ' Among the many eminent writers who have been engaged to furnish contributions to the Sunday edition of The Times, either periodically or occasionally, is Lord Tennyson, with a new short poem, to be printed in autograph.'

"In the plaintiff's prospectus the statement is made, that special articles had been secured, and among others one by Hamo Thornycroft, R. A., ' "How a Statue is Made." Mr. Thornycroft is probably the most distinguished living sculptor ;' and, further, ' Hubert Herkomer, A. R. A., " How a Portrait is Painted.' " And in The Times of Sept. 27th, it is stated : 'Hubert Herkomer will tell how a portrait is painted, and Hamo Thornycroft, the English sculptor, will tell how a statue is made.'

" Other features of similarity might be dwelt upon, but these are sufficient. In the publication of Sept. 27, 1889, out of sixty names appearing in The Times' list, forty-five appear in the prospectus of the plaintiff.

" In view of this very striking and remarkable occurrence of distinguished names in literature, and of the distinct testimony that they were taken from the plaintiff's prospectus, and that the defendant did not, on Sept. 14, 1889, have any contract with any one of these people, the referee must take it as undoubted that the distinct and positive statement contained in The Times of Sept. 14, 1889, that these public writers had been 'engaged to contribute stories to The Times during 1889 and 1890,' a declaration which could only be true as a fact by the acceptance of the terms of the plaintiff's offer, stated in the letter of August 31st, accompanied by the prospectus. Nor is this conclusion affected by the fact, that in the list published in The Times other names appear which are not to be found in the prospectus of the plaintiff. A sufficient number of names had been announced as already engaged for the service to cover the period of the year, and the mere fact that other names were added would not detract, in the judgment of the referee, from the conclusion that the defendant had accepted plaintiff's offer. This act of acceptance of an offer, definite in its terms, constitutes a contract, and the liabilities of the parties thereunder become fixed.

" It was further testified by the plaintiff, that immediately on his return from the West, and immediately after his purchase of a copy of The Times of Sept. 14, 1889, in which he ob-

served the announcement of names of authors taken from his prospectus, he called upon McLaughlin, the manager of the defendant, and said to him, 'I see you have taken it,' and received in reply the answer, 'Yes.'

" This is denied by the defendant's manager, but the denial is a qualified one, based chiefly upon his lack of recollection.

" It becomes unimportant for the referee to determine whether such an interview actually took place or not, for in its nature it could only be evidence of an admission of a fact already sufficiently established by the publication of September 14th. In other words, in the judgment of the referee, the act of publication of Sept. 14, 1889, standing by itself, was a distinct acceptance of the plaintiff's offer, and that what occurred subsequently to that date would not affect it in the slightest degree, except in the way of furnishing additional proof, and whether such additional proof is required or not, becomes unimportant.

" The plaintiff acted upon this acceptance, and furnished matter from time to time, accompanying the first and second parts of the first installment with letters which are in entire harmony with the plaintiff's theory, and which do not support the theory of a terminable contract from week to week. The matter is spoken of as 'installments,' and in the letter of Oct. 4, 1889, the defendant writes: 'We should have every week not less than ten good cuts from two to three columns in size.'

" The matter in time proved objectionable to the defendant, and on the twenty-eighth of October it wrote that if within the next few weeks it perceived no improvement it should discontinue the service. Upon the next day, the plaintiff wrote a letter of Oct. 29, 1889, in which he reaffirmed his position with great clearness, dwelling with particularity upon the fact that his terms for the department were $5,200 for fifty-two weeks, and that there were no terms by the week, and that he had firmly insisted upon this position ; that while he was gone, the advertisement of the Youth's Deparment was made in the columns of The Times, and that this was done with full knowledge of his position in the matter. To this letter there was no reply from the defendant, but the plaintiff went in person to the defendant's office, and he had a heated controversy with the defendant's manager, the final outcome of which was a resort to the courts.

" The referee has had great difficulty in understanding why there should have been a complete change of base on the part of the manager of The Times in accepting the plaintiff's terms, after the united testimony of Mr. McLaughlin and Mr. Waggener and Colonel McClure, corroborated distinctly by the plaintiff himself, that The Times would make no contract for a definite period not terminable at its pleasure; but there is still greater difficulty in the way of harmonizing the remainder of the testimony with the undisputed facts. The facts result in a total failure to agree upon terms prior to the plaintiff's departure for the West, but during that time while he himself was absent, and while the terms of his offer of Aug. 31, 1889, were still insisted upon by him, the defendant made the publication of Sept. 14, 1889. This is a distinct act, stating an accomplished fact, announcing a fixed engagement with certain authors, and, in view of the distinct testimony of The Times' manager that at that time they had no contracts of their own with the authors in question, the statement could not possibly be accepted as true except upon the theory of an acceptance of the plaintiff's terms. The referee can see no escape from this conclusion. It is in harmony with all the testimony in the case, whereas were a contrary result to be reached and the conclusion formed that the publication of Sept. 14, 1889, rested upon an agreement to advance $500, inasmuch as the matter would be taken for five weeks at least, then all the remaining testimony in the case, particularly that relating to the language of the announcement in the columns of The Times of Sept. 14, 1889, as well as of the date of the furnishing of matter, and the various letters passing between the parties, would be out of line, and incapable of proper explanation. It is familiar to all reasoners that where one theory can be found which exactly explains all the facts, that that theory must be preferred to one which if adopted, fails to follow and adequately explain other well-established facts.

" Upon the whole case, therefore, the referee finds that the defendant agreed, through the publication of Sept. 14, 1889, to accept from the plaintiff articles written by the authors mentioned in both papers for the term of one year from Sept. 29, 1889, at the rate of $100 a week, payable weekly, making in all the sum of $5,200."

Exceptions were filed by defendant, and, on its application, the case was reopened to admit the following letter alleged to have been found by defendant after the report, with the cross-examination of plaintiff in relation thereto.

"October 1, 1889.

"My Dear Mr. McLaughlin,

"The Youth's Department has started successfully all around. Most of the famous authors whom I have secured have either sent in their contributions or have agreed to within a short time, so there will be no difficulty in fulfilling the announcements in the prospectus. I realize that the success of the department will depend to a considerable extent upon the features; timely ideas that will be interesting apart from the fame of the author. I, however, find myself crippled for lack of sufficient working capital. All the more expensive features of the Youth's Department that I have secured I have had to pay for in advance, and now that I wish to go on and work out various ideas I find myself hampered for lack of money.

"You were so kind as to say that you would let me have $500 in advance. I hope you will do so. Trusting that you will, I send you herewith a receipted bill for the first five weeks of the service.

"Very truly yours,
(Signed)       "S. S. McClure.

"Frank McLaughlin, Esq.,
"Philadelphia Times."

The referee made the following supplemental report:

"In the judgment of the referee the new points involved are material and important. In his first report, is stated the difficulty he had encountered in reaching a conclusion, owing to the failure on the part of the counsel for the defendant to cross-examine the plaintiff as to the subject-matter of the $500 advance, and also owing to the failure of counsel for the plaintiff to call their client in rebuttal of the testimony of Mr. McLaughlin and Mr. Waggener; with a statement of the controlling effect of the absence of the letter to which that of Oct. 4, 1889, was a reply. . . . .

"The new testimony is of sufficient weight and gravity to justify a re-examination of the facts. Without repeating what

has been said in the first report, it is sufficient to discuss the matter in connection therewith. The plaintiff had three interviews in Philadelphia with Mr. McLaughlin—one prior to his going West, one immediately on his return from the West, and one upon Oct. 29, 1889. In his second cross-examination the plaintiff distinctly denied having had any conversation with Mr. McLaughlin prior to his going West about the latter's advancing him $500, but insisted that what was said about it occurred at the interview after the publication of September 14th, in the columns of the Times. To this conversation he attached but little importance and the events made but little impression on his memory. The letter of Oct. 1, 1889, distinctly shows that in the plaintiff's view there was an assurance of an advance of $500, for which a receipted bill was sent for the first five weeks of the service. The fact that such a conversation did take place is established by indisputable proof. The question is, when did it take place?

" In reviewing the entire testimony, the referee remarks that in the first examination, the plaintiff was entirely silent as to the $500 interview, and there was no reference made to it in his cross-examination, and there was no reference made to it in rebuttal, although it had been testified to by Mr. McLaughlin and Mr. Waggener. In the second cross-examination of the plaintiff he admits that there was such a conversation, but explicitly denies that it took place at the time alleged, to wit: prior to his going West. The effect previously given to his testimony by the referee is therefore lost. The letter of Oct. 1, 1889, now for the first time before the referee, confirms the existence of such a conversation, but throws no light upon the matter of date. When did that conversation take place? Mr. McLaughlin and Mr. Waggener both state it as a part of what was said before the plaintiff went West. The plaintiff says it was after his return from the West. The referee in his first report, upon a full review of the evidence then before him, concluded that Mr. McLaughlin and Mr. Waggener were mistaken as to the date. Is this conclusion to stand undisturbed?

" Three new ingredients have now been introduced into the case—*First*, the plaintiff's admission that there was such a conversation. As to this he was originally silent; now he admits it, both in his second cross-examination, and in the letter of

Oct. 1, 1891.  *Second,* his certainty that Mr. Waggener was present at the conversation before he went West, and his repeated statements that he does not remember his presence at the second interview, which was after his return.   It is clear that Mr. Waggener must have heard the conversation, or he could not have testified to it.    There is no doubt that he did testify to it in specific terms; and it is quite clear that Waggener was present at but one interview.    As Waggener and McLaughlin both fix it as before, and the plaintiff insists that he saw Mr. Waggener but once, and that before he went West, it is clear then that the plaintiff himself, in this important particular, confirms the defendant's position.    *Third,* the third element is that the second cross-examination showed what was not before apparent, that the accuracy of the plaintiff's memory is not to be relied upon with certainty.    The referee does not doubt his integrity.    In fact, the plaintiff impressed him as a very earnest man, of strong convictions, and thoroughly grounded in the belief that he was right; but his own account of his mental operations, and his analysis of his method of stating results, convinces the referee that his memory is not to be relied upon at a contested point, when it comes in conflict with that of other men. The remarks of the referee on page 71 of his former report are no longer applicable.    While it is still true that Mr. McLaughlin's testimony is affected by his cross-examination, yet it is now also true that the plaintiff has been broken on the wheel, and Mr. Waggener stands master of the situation.    The weight of the testimony is now clearly with the defendant.

" The letter of Oct. 1, 1889, while showing the subject-matter, does not fix the date of the conversation.    On the whole evidence, as it now stands, the referee finds, as a fact, that the conversation in relation to the advance of the $500 took place before the plaintiff's trip to the West.    Mr. McClure asked for the sum of $500, after stating his needs.    Mr. McLaughlin replied: ' I guess we will take it for five weeks, anyhow ; I do not object to giving you $500.'    Mr. Waggener testified that Mr. McLaughlin said: ' If you want us to take that matter for a year, make it so good that we cannot do without it, and then we will take it for that length of time,' and they parted with the distinct intimation that the matter might be sent, but if sent, it was to be upon defendant's terms.    This language is

not denied by the plaintiff, although he had an opportunity of denying it when on the stand in rebuttal.   What effect had this conversation?   It is to be observed the plaintiff did not say: 'Well, I will send the matter if you will advance the $500.' Nor did the defendant's witness testify that he agreed to send the matter.   The whole question was left entirely open.   The plaintiff was free to exercise his option or not, and the result of the whole testimony is, that no agreement whatever was reached.   Thus far, there is no contract.   What follows?   The act of publication on the part of the Times in its columns of Sept. 14, 1889.   This act the referee held to be an acceptance of the terms of the plaintiff's letter of Aug. 31, 1889, but at the same time expressed his difficulty in understanding why there should have been, without apparent cause, a complete change of base on the part of the manager of The Times, and a departure from their settled policy.   At that time the fact now found as to the request for $500, and the willingness on the part of the defendant to send it, did not exist.   The request of the plaintiff for money, the confession of his financial needs, and the willingness of the defendant to meet them, furnish some explanation of the act of publication, not a sufficient or convincing reason, it is true, nor one sufficiently defined, out of which to construct a contract for a limited time, but it is an explanation of an act which, without it, was inexplicable.   It furnishes some ground for the expectation that ultimately the plaintiff would accede to the defendant's terms.   While it does not justify the publication in terms so positive and express as the language of the advertisement of Sept. 14, 1889, yet it robs the mere act of publication of the full force accorded to it, of constituting an unqualified acceptance of the plaintiff's offer of August 31st.   The publication is to be taken in connection, of course, with the words testified to by Mr. McLaughlin and Mr. Waggener, 'We will take it for five weeks at least; make it so good that we will have to take it for a longer time.'   These words were not denied by Mr. McClure on his re-cross-examination, nor in rebuttal.   They must be taken as unchallenged, and as constituting a part of the conversation held prior to McClure's trip to the West.   They cannot be referred to another time.

"In this state of the evidence, which has been thrown into

uncertainty by the introduction of new matter, our previous view of all the testimony in the case does not help the matter as to what took place at or about the time of the publication of September 14th. The letters written subsequently do not clear the matter. They do not state the terms of the contract except so far as the letter of October 28th is concerned. There is no written denial of the terms of that letter by the defendant, but an angry interview took place the next day at the office of The Times, which resulted in such a breach as to bring on the present litigation. It is clear that if the letters were written by each party with a different basis in mind, then the parties were not meeting at any point upon a common plane. It is necessary, of course, to constitute a contract, that the minds of the parties should come together at some particular point, upon some definite terms. While the referee cannot find any distinct contract on the part of the plaintiff to accept, or the defendant to pay the sum of $500, which could be made the basis of the publication of Sept. 14, 1894, yet he cannot find, with that conversation, relating to the advance of the $500 staring him in the face, that the act of publication was a distinct and unqualified acceptance of the letter of August 31st. The whole matter, as the parties themselves admit, resulted in no contract at all; and if the act of publication of September 14th is affected, as in the judgment of the referee it must be, by the previous conversation in reference to the $500, then that act, qualified as it is, does not, per se, constitute an acceptance of the proposition of August 31st, and therefore, in that respect, there is no contract.

"As the evidence appeared at first, there was nothing to stand between the letter of August 31st, as a pending offer, and the publication of September 14th, as an unconditional acceptance. The acceptance closed upon the offer without the intervention of a single fact which could qualify its character. As the evidence stands now, the two are separated by the request of the plaintiff for an advance of $500, and the willingness of the defendant to accede to the request. This phase of the matter is colored, also, by the expression that if the plaintiff wanted the defendant to take his matter for a year, he should make it so good as to ensure its doing so. The plaintiff did not bind himself to send the matter, but in behalf of the de-

fendant it was stated that, if he did so, it must be upon defendant's terms. To this the plaintiff did not accede. The parties separated with no agreement. This cannot be doubted. The testimony of all the witnesses is to this effect.

"Following this request of the plaintiff for an advance, and the statement of his needs, revealing a condition of weakness, the next step in the order of events is the publication of September 14th. Its terms and its absolute character have been already dwelt upon. Standing alone, it constituted an acceptance of the letter of August 31st. Standing with the request for the advance and the accompanying statements, it does not appear to the referee as intended to constitute an acceptance of the terms of the letter of August 31st. Unless it was so intended, a contract cannot be found to exist. Unless the intentions of the parties concur, there cannot be a contract. It is true its absolute terms were not justified by the request for an advance of $500, promised on the supposition that the matter would be taken for five weeks at least. It went far beyond this; but in view of what had gone before, it was based upon the probable expectation that the plaintiff would yield—an expectation growing not improbably or unnaturally out of the statement of the plaintiff of his needs, and the thought that he might make the matter acceptable for a year. This seems to the referee to be the natural result of what had taken place, for it must not be forgotten that the defendant's officers were as fixed in their policy and methods of dealing, and as firm in their refusal to accede to the plaintiff's terms, as he himself had been towards their propositions. . . .

"Does the language of the publication of September 14th work an estoppel against the defendant? Can it qualify the language, general as it is, of its publication? . . . . The question is as to the existence of a specific contract between the parties to the suit. Unless the plaintiff can make out a contract definite in its terms and free from doubt, he must fail in this action. Up to this point, then, in the analysis of the testimony, as so materially changed by the new testimony, the referee fails to see convincing proof of the contract declared on. What follows the publication of September 14th? The visit of the plaintiff to The Times office. He meets Mr. McLaughlin, having, in consequence of what Charles Emory Smith

said, purchased a copy of The Times, and read the publication of September 14th. He says 'I see you have taken it.' These words are ambiguous, but the referee understands them to mean the matter called for in his letter of August 31st, and on the terms there stated. It must be remembered that this statement is part of the testimony as originally taken. But with the new testimony modifying the offer of that letter, the word 'it' becomes indefinite. Moreover, if the plaintiff's contention is true that all that was said as to the $500 advance was said at this time, and not before, then all that Mr. McLaughlin said, corroborated by Mr. Waggener, is entirely inconsistent with the idea that the publication of September 14th was a contract on the basis of the letter of August 31st. Mr. McLaughlin says: 'He' (McClure) 'said, " I am pretty hard up for money, and I want to know if you will let me have some money." I said, "I guess so. How much do you want?" He said, "$500." I said, "I guess we will take it for five weeks anyhow. I do not object to giving you $500."' Mr. Waggener says: 'Mr. McClure wanted some money, and Mr. McLaughlin asked him how much he wanted. Mr. McClure said about $500 and Mr. McLaughlin agreed to give it to him and said: "I guess we will take it for five weeks anyhow. We will advance you $500."' Now if this be so—and let it be observed that the plaintiff nowhere denies it as having been said—he simply contends that it was said *after* his return from the West—then it would be so clearly inconsistent with the plaintiff's idea of his rights, that instead of making no impression on him, he would have perceived its inconsistency and argued or protested. It would have reopened the entire discussion. There is nothing of that in the case, on the showing of anybody. As has been shown, the plaintiff, by fixing Mr. Waggener's presence at the first meeting only, has given a date to Mr. Waggener's testimony adverse to his own contention here. Mr. Waggener could not have invented his testimony. He swears to what he heard. The plaintiff shows that it must have been at the first meeting, and thus states himself out of court on this point. The rest of the interview, which the plaintiff asserts was short and made but little impression on him—as he was anxious to get home—related to illustrations.

" The next step is the furnishing of the matter—Septem-

ber 18th. As the testimony now stands, this is no longer the pivotal point of the case. The plaintiff was not bound to have furnished it. In the shape in which the whole matter now appears, the defendant could not have insisted upon the matter. If there was doubt in the mind of the plaintiff, he could have guarded himself by letter. He did ask for a contract in the interview of October 29th, that is, he asked for a contract embodying ' the terms of our arrangement.' Did not this imply uncertainty? His request was refused, as Mr. McLaughlin said they did not make contracts in that way. Here, then, was a difference between the parties. If the plaintiff furnished the matter with one idea in his mind, and the defendant accepted it with another, in that of their manager, then there was no contract on the basis of the letter of August 31st. The most that the defendant would be liable for would be the value of the matter used by it,—and for everything that it did actually receive and use it has paid in full.

" The analysis of the testimony, therefore, results in this— that there is at no time a concurrence of view on the part of the plaintiff and defendant. There is no adoption of a specific proposition; there is no mutual understanding. On the contrary, there appears to be a mutual misunderstanding, and the legal result is no contract. It is the plaintiff's duty to clear up the doubt. The burden of proof is upon him. He does not convince the referee, as it is his duty to do, that the defendant accepted his matter distinctly on the terms of the letter of August 31st. The result of the introduction of his letter of October 1st, and of his cross-examination, has been to destroy the previous balance of the case, and to render doubtful that which the referee previously considered free from doubt.

. " Whichever way the case is viewed, the referee encounters difficulty. It is impossible to harmonize all the conflicting pieces of testimony. This may work a hardship, but before an award of a large sum of money can be made, it is the duty of the plaintiff to comply with the rule of law, that he must establish conclusively the basis of his contract. In this case, he has failed to do so, and the finding must be for the defendant, with costs.

" The referee finds for the defendant, with costs."

*Error assigned* was the finding of the referee for the defendant.

*John G. Johnson, D. Webster Dougherty* with him, for appellant.—The referee finds that standing alone without the request for a loan, the publication of the prospectus was an acceptance of plaintiff's terms, but taken in connection with the request it was affected by it to such an extent as to deprive it of that effect.

Certainly, there must have been some basis or reason for the defendant's act. Either it thereby agreed to plaintiff's terms, or it was warranted by something that had already happened in believing that plaintiff had agreed to its terms. The referee rejects both of these inferences and finds that plaintiff had not agreed to defendant's terms, and defendant had no intention of accepting his terms.

This is in substance a finding as a fact that defendant, in publishing the prospectus, intended not to comply with plaintiff's terms, but to so use his property as to effectually prevent him from disposing of it elsewhere, and thereby force him into accepting its terms. Such a conclusion practically brands the defendant as guilty of a gross outrage on plaintiff's rights amounting to theft. It is a conclusion which is unwarranted by anything in the evidence, and one which this court has positively said can never be drawn by a court: Good Intent Company v. Hartzell, 22 Pa. 277.

*James H. Shakespeare,* for appellee.

OPINION BY MR. JUSTICE McCOLLUM, July 18, 1895:

The single question involved in this case is whether there was an unqualified acceptance by the defendant company of the offer contained in the plaintiff's letter of Aug. 31, 1889. It is a question of fact to be decided upon the evidence, and the learned referee, to whom it was submitted under the act of 1874, having carefully and intelligently considered it, found that the offer was not so accepted. His finding is like that of a jury, and the familiar rule applicable to it is that it cannot be reversed on appeal if the evidence fairly warranted it. A

patient study of the evidence in connection with the referee's discussion of it has convinced us that no item of it was overlooked or ignored in reaching the conclusion we are required to review. While there may be room for disagreement concerning the correctness of the finding, there can be none for doubt that it was the result of a conscientious performance of duty. In view of the full and clear statement and discussion of the evidence in the referee's report, there is no occasion for including it, or for noting the bearing of every detail of it, in this opinion. It is sufficient for our purpose to note the salient features of it, and their legitimate influence in the decision of the question raised by the pleadings. In the first place, it is obvious and undisputed that an acceptance of the plaintiff's offer by the defendant company would have constituted a plain departure from its well settled policy in matters of this nature and compelled it to pay for literary work which might prove to be wholly unsuited to its needs. It also distinctly appears in the testimony and is conceded by the plaintiff that the company flatly refused to accept his offer, and named the only terms on which it was willing to contract with him in relation to the subject of it. In close connection with this refusal and the indication of a willingness to take the matter offered, on the terms proposed by the company, the plaintiff said to McLaughlin, its representative in the negotiations, that he was in need of money and inquired if he could have some. He was asked how much he wanted and he replied, "five hundred dollars." He was told that he could have it, as the company would probably take the proffered matter "for five weeks anyhow." He was asked "when he was going to send it," and he said: "I am going to try to get it up right away." To this, McLaughlin, speaking for the company, said, "all right." This conversation was in the company's office in Philadelphia before the plaintiff went West, and it is not claimed by either party that previous to or at that time there was an express acceptance by him of the company's offer or an express or implied acceptance by the company of his offer. The plaintiff however says that on his return from the West he was shown an announcement in The Times of September 14th, which he construed as an acceptance of his offer of August 31st, and that he said to McLaughlin, "I see you have taken it," and McLaughlin replied, "Yes." It is

upon the announcement referred to, and the remark and answer alleged to have been made two days after it, that the plaintiff rests his claim. Referring to the remark the plaintiff says he made on that occasion and to McLaughlin's alleged answer to it, the latter says, "nothing of the kind ever occurred." In view of the fact that the remark, "I see you have taken it," is ambiguous, and of the conclusion of the learned referee that the plaintiff's "memory is not to be relied upon at a contested point when it comes in conflict with that of other men," we think that his contradicted and uncorroborated testimony as to what was said in the admittedly brief interview between him and McLaughlin on the 16th of September, cannot be regarded as an important factor in the decision of the case. In the light afforded by the testimony taken after the case was reopened, it is obvious that what was said by the plaintiff in his letter of October 1st, about the advance of five hundred dollars, referred to his conversation with McLaughlin before he went West, and, as we have already seen, the proposal to advance this sum was connected with and qualified by the offer the company then made.

If it be conceded that the announcement in The Times, of September 14th, would warrant an inference favorable to the plaintiff's contention, it is certain that there was nothing in it which precluded the company from asserting the truth as a defense to this action. It was at most an item of evidence to be considered with other evidence in the case, in determining whether there was an acceptance by the company of the plaintiff's offer. The learned referee found against the plaintiff on this pivotal point, and the evidence fairly sustains his finding. This conclusion renders separate consideration of the thirty-nine specifications of error unnecessary. We overrule all of them.

Judgment affirmed.