In re The **APPLIANCE STORE, INC.;** and Northeast Consumer Technology Stores, Inc., Debtors.

**ALLEGHENY CENTER ASSOCIATES,** Movant,

v.

The **APPLIANCE STORE, INC.,** Respondent.

Bankruptcy Nos. 92–1573–BM, 92–1574–BM. Motion No. 92–2857M.

United States Bankruptcy Court, W.D. Pennsylvania.

Nov. 20, 1992.

James H. Norris, Eckert Seamans Cherin & Mellott, Pittsburgh, PA, to movant/Allegheny Center Associates.

Norman E. Gilkey, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, PA, to debtor/The Appliance Store, Inc.

David K. Rudov, Rudov & Stein, Pittsburgh, PA, to The Committee of Unsecured Creditors.

Lisa A. Bookman, Bernstein and Bernstein, P.C., Pittsburgh, PA, to J.J. Gumberg Co.

Stephen I. Goldring, Office of U.S. Trustee, Pittsburgh, PA.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Allegheny Center Associates ("Allegheny") has submitted a motion for payment of administrative rent. Allegheny asserts that it is entitled, pursuant to a written lease with debtor The Appliance Store, Inc. ("debtor"), to immediate payment of $44,-137.93 in rent as an administrative expense.

Debtor and The Committee of Unsecured Creditors ("Committee") oppose the motion on several grounds.

They first assert that there was a postpetition oral amendment to the lease and claim that all administrative rent due and owing up to July 4, 1992, when debtor vacated the leasehold premises and returned possession of it to Allegheny, were paid pursuant to the terms of the alleged oral agreement.

Debtor and the Committee further maintain that Allegheny's claim for administrative expenses is limited to the time when debtor was in possession of the premises. Allegheny, they contend, is not entitled to administrative rent subsequent to July 4, 1992. Two arguments have been advanced in support of this latter position. Allegheny is not entitled to administrative rent subsequent to effective rejection of the lease. According to debtor and the Committee, rejection of the lease effectively occurred when debtor vacated and surrendered the premises. Court approval, they argue, is not a condition precedent to effective rejection of the lease. In addition, debtor and the Committee argue that Allegheny is not entitled to administrative rent for the period subsequent to July 4, 1992 because no benefit was conferred upon the estate by Allegheny after debtor vacated and surrendered the premises.

Allegheny will be awarded $44,137.93 in administrative rent for the period from June 1, 1992 through September 1, 1992, when the court issued an order authorizing debtor to reject the lease. However, Allegheny will not be paid immediately. Payment shall be deferred until distribution is made to all creditors.

## I

## FACTS

Debtor is in the retail appliance business. It sells household appliances and electronic

goods through retail outlets to consumers in Pennsylvania, Ohio, and West Virginia.

Allegheny operates a shopping mall known as Allegheny Center Mall ("the mall") in Pittsburgh, Pennsylvania.

On December 2, 1982, debtor and Allegheny executed a written agreement whereby debtor leased retail space on the second floor at the mall for a term of ten (10) years commencing on March 1, 1983. Paragraph 11.6 of the lease agreement provided in pertinent part as follows:

> There are no oral or written agreements between Landlord and Tenant affecting this Lease other than this Lease, including exhibits. This Lease may be amended only in instruments in writing executed by Landlord and Tenant.

The mall had approximately eighty (80) tenants when the lease was executed. Sears and Zayre were the "anchor tenants" and were counted on to draw customers into the mall.

The tenant mix in the mall had changed considerably by October of 1990. Zayre was in the process of leaving. Several other retail tenants located on the second floor had left the mall. Much of the space on that floor was being rented to office tenants.

Debtor, like other retail tenants in the mall, experienced a decline in business due to the decrease in customer traffic. On December 1, 1991, debtor and Allegheny executed a written amendment to the lease. Debtor moved from the second floor to the first floor. Except for the change in location, all other items and provisions of the lease executed on December 2, 1982, remained in full force and effect.

Business at the mall continued to decline and several more tenants left. Sears, the other anchor tenant, vacated the mall in February of 1992. Neither anchor tenant has been replaced.

Debtor filed a voluntary chapter 11 petition on April 17, 1992. Northeast Consumer Technology Stores, Inc., debtor's sister company, also filed a chapter 11 petition that same day.

On May 1, 1992, debtor filed a motion to extend the time in which to reject certain leases of nonresidential real property, including the lease for its store in Allegheny Center Mall.

Debtor concluded after it had filed for bankruptcy that it would have to close some of its stores. Shortly thereafter, debtor decided to close the store in Allegheny Center Mall because it was unprofitable. The store initially was to close in late-May of 1992. However, due to a change in circumstances, it was decided that the store would close on May 16th or May 17th. Store personnel were directed to begin closing the store and merchandise was moved to other stores which were to remain open.

Allegheny learned of debtor's intentions on May 14, 1992. David Knight, a principal of Allegheny and its President, contacted Frank Quigley, debtor's Vice President for Finances, to inquire whether the rumor that debtor was leaving the mall was true. Knight, upon learning that debtor intended to vacate in a few days, asked Quigley what it would take to induce debtor to stay. Quigley responded that debtor would be willing to stay if the rental were reduced to two percent (2%) of gross annual sales and debtor could vacate with thirty (30) days' advance notice.

Knight conferred with Allegheny's principals and contacted Quigley on May 15th. He proposed to Quigley that debtor pay two percent (2%) of its first $1 million in annual sales, five percent (5%) of its annual sales between $1 million and $1.5 million, and six percent (6%) of gross sales exceeding $2.5 million. He further proposed that debtor give Allegheny ninety (90) rather than thirty (30) days' advance notice of its intention to vacate. Knight further proposed that debtor's counsel meet with Allegheny's counsel to reach a written agreement and asked Quigley to send a "letter of acceptance" indicating debtor's acceptance of the terms proposed by Knight.

Immediately after his conversation with Knight, Quigley notified employees at the store that they were to keep it open.

Quigley never sent the "letter of agreement" as requested by Knight.

Although debtor's counsel and Allegheny's counsel met on May 21st and again on May 29th, no written agreement was ever reached. Negotiations broke down when debtor's counsel insisted that Allegheny agree to waive any claim for damages in the event debtor eventually rejected the lease.

An order was entered by the court on June 4, 1992 granting debtor an extension until September 8, 1992 to reject Allegheny's lease. The order provided in pertinent part that:

Debtors are required, as a condition of said extension, to remain current on all postpetition payments and other obligations under the leases which debtors have not rejected.

It soon became apparent to debtor that its store in the mall would not generate sufficient revenues to justify keeping it open. Gross sales during the month of June were only $40,205.73.

On July 3, 1992, Quigley sent the following letter to Knight:

I am writing to inform you that it will be necessary for us to close our Allegheny Center store as of the close of business on July 4, 1992.

In spite of your generous offer to offer a reduced rental, we have determined that the volume we can anticipate at this location will not be sufficient to cover operating expenses and result in an acceptable store contribution.

Debtor vacated the store and turned over the keys to the mall manager on July 6, 1992. A new tenant has not been found and the space remains vacant.

Approximately three (3) weeks later, on July 27, 1992, debtor's controller sent the following letter to Allegheny. The letter was sent to Allegheny's lock box at Pittsburgh National Bank ("PNB"):

Enclosed you will find check ᴈ 14405 in the amount of $890.53. This payment covers the period June 1 through the store's closing date of July 4, 1992 for rent related amounts owed calculated at a 2% rate. The monthly break down is a (sic) follows:

| | |
|---|---|
| June '92 Total Sales | $40,205.73 |
| July '92 Total Sales | 4,320.40 |
| Total | $44,526.13 |
| Rate | 2% |
| Amount Due | $ 890.53 |

If you have any questions, please let me know.

Allegheny maintained a lock box at PNB where payments from its lessees were received and processed. PNB deposited the check into Allegheny's account upon receiving it. Allegheny did not see or handle the check and first learned of it after it had been processed by PNB.

On July 31, 1992, debtor filed a motion to reject several leases, including the lease at the mall. The Committee consented to the relief requested by debtor.

On August 7, 1992, Frank Omecene, Allegheny's controller, responded by letter to the letter of July 27, 1992 sent by debtor's controller. The letter reads in pertinent part as follows:

... [A]s I stated to you on the phone, there was no agreement with our organization and your organization where you were to pay two percent (2%) as a total rental package. Since you are in bankruptcy, your full monthly rent is due as administrative rent under the bankruptcy laws.

Please remit the amounts due Allegheny Center Associates based on the full monthly rent for the months of June, July and August which amounts to $40,-213.68 plus a pro rata portion of the 1992 Real Estate Taxes of $5,388.77, less the payment received from you of $890.53, which results in an amount due of $44,-711.92 for postpetition rent.

... [P]lease submit the total amount of $44,711.92 immediately as it is due under the Bankruptcy laws as postpetition rent.

An order was entered by the court on September 1, 1992 approving debtor's rejection of the leases, including the one with Allegheny. Lessors whose leases had been rejected were granted thirty (30) days to file claims for damages.

On September 8, 1992, Allegheny filed its request for payment of administrative rent

which is now before the court. Allegheny claims in its brief that it is entitled to $44,137.93 as an administrative expense for the period from June 1, 1992 until September 1, 1992, based on a monthly rental obligation of $14,417.45.

A hearing on Allegheny's request was held on October 6, 1992. Allegheny and debtor were permitted to offer whatever evidence they deemed appropriate.

## II

## ANALYSIS

Several issues have been raised by the parties.

### A) *Postpetition Oral Amendment Of The Lease*

The first issue that must be resolved is whether there was a postpetition oral amendment to the lease which provided that debtor would pay rentals amounting to only two percent (2%) of annual gross sales.

Debtor maintains that such an oral amendment occurred and insists that it is enforceable.

Allegheny denies that any amendment was ever agreed to and denies that any such amendment would be enforceable.

■■■ Simply stated, in order for an enforceable contract to exist, there must be an offer and acceptance which signifies that a "meeting of the minds" has occurred. See *Hahnemann Medical College and Hospital v. Hubbard,* 267 Pa.Super. 436, 439–40, 406 A.2d 1120, 1122 (1979). The terms assented to must be identical with the terms of the offer and without qualification or condition in order for there to be a "meeting of the minds". See *McClure v. Times Publishing Co.,* 169 Pa. 213, 32 A. 293 (1895). A response which purports to accept an offer but which adds a new term or qualification to the original offer is a counter-offer, not an acceptance. See *Selig v. Philadelphia Title Ins. Co.,* 380 Pa. 264, 271, 111 A.2d 147, 150 (1955). There is no "meeting of the minds" when a new or additional term is introduced which

purports to be an acceptance. See *Brentwood Realty Co. v. Moses,* 73 Pa.Super. 307 (Pa.Super.1920).

■■■ The party relying on the existence of a contract has the burden of proving its existence. See *Viso v. Werner,* 471 Pa. 42, 46, 369 A.2d 1185, 1187 (1977). The existence of a contract, its terms if it is oral, and the agreement of the parties may be demonstrated either by the words of the parties or by their conduct and surrounding circumstances. See *Yezbak v. Croce,* 370 Pa. 263, 266, 88 A.2d 80, 81 (1952).

■■■ The totality of the circumstances indicates that, although they conducted negotiations to amend the lease, debtor and Allegheny never reached agreement to do so. There was no "meeting of the minds" as to essential terms and conditions.

As has been shown, the parties discussed what it would take to keep debtor from leaving the mall. Quigley responded that debtor would be willing to stay if certain terms of the lease were amended in a way that was more favorable to debtor. Knight conferred with Allegheny's other principals and then informed Quigley the next day that Allegheny would be willing to amend the lease. However, Knight proposed terms which differed significantly from those proposed by Quigley. The most reasonable interpretation of these events is that Allegheny had not accepted the offer as proposed by debtor but instead had made a counter-offer.

Subsequent events indicate that debtor never accepted Allegheny's counter-offer. It was decided that Quigley would send a "letter of agreement" to Knight and that Allegheny's counsel would meet with debtor's counsel to forge a written agreement. Quigley never sent a "letter of agreement" to Knight. In addition, their counsels met on two occasions but were unable to put together a written agreement. Debtor balked at the ninety-day advance notice proposed by Allegheny.

The letter sent by Quigley to Knight on July 3, 1992 reinforces the conclusion that debtor never accepted Allegheny's counter-offer. In that letter, Quigley spoke of

Allegheny's "generous offer to offer a reduced rental". The phrase "offer to offer" appears to be a synonym for the word "counter-offer". Quigley, a sophisticated businessman, would not have so characterized Allegheny's proposal had debtor unequivocally accepted it.

■ The fact that the check in the amount of $890.53 which debtor sent on July 27, 1992 was negotiated does not indicate that Allegheny had accepted the terms proposed by Quigley on May 14, 1992. As has been noted, the check and accompanying letter had been sent directly to Allegheny's lock box at PNB, which automatically processed the check. Allegheny had no knowledge of the check or the letter before the former was deposited into its account.

To summarize, there was no oral amendment to the written lease executed on December 2, 1982 and subsequently amended on December 1, 1991. The terms and conditions of the lease executed on December 2, 1982 were in effect when debtor vacated the leasehold premises in the mall shortly after July 4, 1992.

*B) Effective Date Of Rejection Of Lease.*

■ The second issue that must be resolved is whether the effective date of rejection of the lease occurred on July 4, 1992, when debtor vacated the leasehold premises, or occurred on September 1, 1992, when this court issued an order approving rejection of the lease.

Debtor asserts that Allegheny is not entitled to administrative rent after debtor vacated the premises on July 4, 1992. According to debtor, rejection of the lease effectively occurred when it vacated the premises. Court approval, it insists, is not a condition precedent to effective rejection.

Allegheny asserts that it is entitled to administrative rent until the court entered the order approving rejection of the lease. According to Allegheny, rejection did not effectively occur when debtor vacated the premises. Court approval, it insists, is a condition precedent to effective rejection.

Several considerations when taken together indicate that court approval is a condition precedent to effective rejection of an unexpired lease of nonresidential real property. Debtor did not effectively reject its lease with Allegheny until September 1, 1992.

11 U.S.C. § 365(a), which governs rejection of unexpired leases of the debtor, provides in pertinent part as follows:

> . . .[T]he trustee [1], *subject to the court's approval*, may assume or reject any executory contract or unexpired lease of the debtor (Emphasis added.)

The plain, unequivocal language of the provision indicates that court approval is a precondition to a debtor's rejection of a lease. See *Sealy Uptown v. Kelly Lyn Franchise Co. (In re Kelly Lyn Franchise Co.)*, 26 B.R. 441, 444 (Bankr.N.D.Tex. 1983); *In re National Oil Co.*, 80 B.R. 525, 526 (Bankr.D.Colo.1987); *In re Revco D.S., Inc.*, 109 B.R. 264, 267 (Bankr.N.D.Ohio 1989).

A comparison of the provisions of the present Bankruptcy Code ("Code") to those of the former Bankruptcy Act ("Act") reinforces this conclusion.

The Act did not prescribe any formal procedure for rejecting unexpired leases. Courts were split as to whether rejection could be inferred from a debtor's conduct or whether court approval was required in order for rejection to occur.

Some courts held that assumption or rejection could be inferred from acts or oral statement as well as by written declarations. Acceptance or rejection could be accomplished without prior court approval. See *In re Forgee Metal Products, Inc.*, 229 F.2d 799, 801 (3d Cir.1956); *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1007 (3d Cir.1973); *Nostromo, Inc. v. Fahrenkrog*, 388 F.2d 82, 85 (8th Cir.1968).

Other courts held that court approval was required before acceptance or rejection

---

1. The term "trustee" in this instance also refers to a debtor-in-possession. See 11 U.S.C. § 1107(a).

could occur. See *Texas Importing Co. v. Banco Popular de Puerto Rico*, 360 F.2d 582, 584 (5th Cir.1966); *Bradshaw v. Loveless (In re American National Trust)*, 426 F.2d 1059, 1064 (7th Cir.1970).

The present Code differs significantly from the former Act in that the procedure whereby assumption or rejection can occur is specified. As has been noted, Section 365(a) expressly provides that assumption or rejection of an unexpired lease is "subject to court approval".

Section 365(a) of the Code is augmented by certain bankruptcy rules which specify the nature of the procedure to be followed in assuming or rejecting an unexpired lease. Bankruptcy Rule 6006(a) specifies that proceedings to reject an unexpired lease shall be governed by Bankruptcy Rule 9014, which provides in pertinent part that:

> ... [R]elief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.

It should come as no surprise that the former Act and the various interpretations thereof resulted in confusion and uncertainty where assumption or rejection of unexpired leases of realty were involved. Section 365(a) overruled by legislation those cases which required a court to examine the words and actions of a debtor to ascertain whether it had effectively rejected a lease. See *Treat Fitness Center, Inc. v. Rainbow Investment (In re Treat Fitness Center, Inc.)*, 60 B.R. 878, 879 (9th Cir.BAP 1986). It accomplished this by eliminating the need for the court to undertake the often difficult task of interpreting a party's conduct and instead required that the debtor seek the court's approval. See *In re A.H. Robins Co., Inc.*, 68 B.R. 705, 708 (Bankr.E.D.Va.1986).

Debtor's rejection of the lease was not effective until September 1, 1992, when the court approved debtor's motion to reject it.

### C) *Entitlement To Administrative Rent*

The third issue is whether rental payments due under the lease for the period from July 4, 1992 through September 1, 1992 qualify as an administrative expense.

Debtor argues that rents incurred during that period do not qualify as an administrative expense because they do not represent "actual, necessary costs and expenses of preserving the estate", as is required by 11 U.S.C. § 503(b)(1)(A).

Allegheny argues that the full amount of rent due under the lease qualifies as an administrative expense, without regard to Section 503(b)(1)(A).

■ Debtor's contention is without merit. Allegheny is entitled to payment as an administrative expense of the full amount of rent due under the lease for the period from July 4, 1992 through September 1, 1992.

11 U.S.C. § 503(b)(1)(A) provides that administrative expenses shall be allowed, after notice and a hearing, for "the actual, necessary costs and expenses of preserving the estate". In order for an expenditure to qualify as "actual" and "necessary", it must benefit the estate as a whole. See *In re Jartran, Inc.*, 886 F.2d 859, 871 (7th Cir.1989). The benefit must be actual, as opposed to potential. See *In re Subscription Television of Greater Atlanta*, 789 F.2d 1530, 1532 (11th Cir.1986).

Debtor's reliance upon Section 503(b)(1)(A) is misplaced. A landlord is entitled to postpetition administrative rent at the rate provided for in the lease, including all charges provided for, through the date on which the court approved rejection of the lease. See *In re CSVA, Inc.*, 140 B.R. 116, 119 (Bankr.W.D.N.C.1992).

The controlling provision, with respect to this issue is 11 U.S.C. § 365(d)(3), which provides in pertinent part as follows:

> The trustee shall timely perform all the obligations of the debtor, ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1)(A) of this title. (Emphasis added.)

The clear language of this provision requires the trustee (or debtor-in-possession

in a chapter 11 case) to perform in a timely manner all postpetition obligations which arise under an unexpired lease until the lease is assumed or rejected. It has been determined that the lease in question was not effectively rejected until September 1, 1992, when an order was issued approving rejection of the lease. Included among the obligations arising under the lease was the obligation to pay as they became due all rentals and other charges specified therein. Accordingly, debtor is obligated by the express language of section 365(d)(3) to pay to Allegheny all rentals and other charges due under the lease through September 1, 1992.

The obligation of the trustee to perform in a timely manner is mandatory, not permissive. These obligations are not excused if the trustee fails to perform. Instead, the lessor is entitled to a postpetition claim for administrative rent. See *In re CSVA*, 140 B.R. at 119.

It does not matter in this case that debtor had turned over possession of the premises to Allegheny shortly after July 4, 1992, approximately seven (7) weeks before the order of court issued on September 1, 1992. Allegheny need not establish that the requirements of Section 503(b)(1)(A) have been met in order for the rentals due subsequent to July 4, 1992 to qualify as an administrative expense. Section 365(d)(3) provides that the trustee must perform such obligations "notwithstanding Section 503(b)(1)"—i.e., in spite of or without regard to it. See *In re CSVA*, 140 B.R. at 119–20.

■ Debtor in various prayers for relief seems to argue that the bankruptcy court, as a court of equity, should intervene on its behalf in an effort to enhance its reorganization efforts.

As has been stated, debtor vacated the premises in very early July of 1992, but did not file this motion to reject until the very last day in July of 1992. Said filing occurred on a Friday. Accordingly, the first day this court became aware of this request was Monday, August 3, 1992.

During the course of these proceedings debtor has not been reluctant to request an expedited hearing when it deemed the matter important enough to warrant same. To the contrary, it appeared to this court that debtor requested and received expedited scheduling even when no true basis existed.

In weighing the equities of the positions it is difficult to sympathize with debtor's plight. To the contrary, the landlord had a valid lease and had the expectation that it would run its course to a conclusion. As a result of the bankruptcy laws debtor is able to reject the lease, leaving respondent to remedies which will hardly equal what it would have received had debtor complied with the lease terms.

On the other hand, we have the debtor, albeit properly utilizing the laws of the United States of America, modifying the rights of its landlord.

Simple fairness dictates that debtor not vacate on July 6, 1992 and wait until July 31, 1992 to file its motion to reject. If the matter was as grave as debtor now suggests, a request for an expedited hearing could have been made and, in all probability, granted. From the above it appears the equities lies with the landlord.

Allegheny is entitled to payment as an administrative expense of all rentals and other charges due.

### D) *Allegheny's Entitlement To Immediate Payment.*

■ The final issue is whether Allegheny is entitled to immediate payment of its administrative claim.

Allegheny insists that it is entitled to immediate payment. Debtor has neglected to address this issue, as perhaps it was confident of prevailing on previous issues.

A claim for administrative rents pursuant to Section 365(d)(3) generally is entitled to immediate payment, absent a showing of substantial doubt that sufficient funds will be available to pay all administrative claimants in full. See *In re Four Star Pizza, Inc.*, 135 B.R. 498, 500 (Bankr.W.D.Pa. 1992).

The court has reviewed the entire record in this case and is concerned that there may not be sufficient funds with which to pay all administrative claimants in full.

Interim applications for payment of professional fees and expenses for services rendered during the first six (6) months of these bankruptcy cases have been submitted from counsel to debtor-in-possession, counsel to the Committee, accountant for the Committee, and counsel to a secured creditor. The total requested by these professionals comes to $617,163.66. It should be noted that all of these applications are interim. Some applicants can be expected to submit additional applications for services rendered later in this case.

In addition to the above interim applications, several applications for payment of administrative rent totalling $96,610.23 also have been submitted.

In all, applications for payment of administrative expenses totalling $713,773.89 have been filed to date. As has been noted, it is reasonable to anticipate that additional fee applications will be submitted in the future.

Except for Allegheny's application, no determination has been made with regard to the above applications. They may or may not be granted in full.

The court has grave reservations concerning debtor's ability to pay all of these administrative claims in full. Debtor's financial situation was precarious at best when they filed for bankruptcy. Subsequent events have done little to instill in the court confidence that their situation has substantially improved since they filed or will improve in the foreseeable future.

Allegheny's request that its administrative claim be paid immediately must be denied. It will be paid when distribution is made to all administrative claimants. Should there be insufficient funds to pay all allowed administrative claims in full, Allegheny shall be paid at the time of distribution on a pro rate basis.