**In re Nolan E. McSHERIDAN and Jennifer K. McSheridan, Debtors.**

**Robert KUSKE and Jackie Kuske, Appellants,**

v.

**Nolan E. McSHERIDAN and Jennifer K. McSheridan, Appellees.**

**BAP No. WW–94–1676–OHMe.**

**Bankruptcy No. 94–00331.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Jan. 19, 1995.

Decided June 21, 1995.

**94**

Paul J. Cassel, Wenatchee, WA, for appellants.

Robert L. McAdams, Seattle, WA, for appellees.

Before OLLASON, HAGAN and MEYERS, Bankruptcy Judges.

*OPINION*

OLLASON, Bankruptcy Judge:

## OVERVIEW

Lessor's guarantors under a commercial real property lease appeal an order of the bankruptcy court allowing them an unsecured claim for damages due to termination of the lease. The court limited all damages by the provisions of § 502(b)(6) [1] and did not include amounts under various nonrental covenants within the definition of "rent re-

---

1. Unless otherwise indicated, all references to "section" or "chapter" will be to the Bankruptcy Code, 11 U.S.C. §§ 101–1330.

2. The rent is "net" to the landlord because the tenant takes responsibility for taxes, operating expenses, and the like. *See James v. C.I.R.,* 899

served" under the lease. § 502(b)(6)(A). **We Remand.**

## STATEMENT OF FACTS

In July of 1985, Nolan and Jennifer McSheridan ("Debtors") formed a Washington corporation to operate a restaurant in Bellingham, Washington. The restaurant was subject to a commercial lease. The Debtors' corporation ("Lessee") assumed the lessee's interest in the lease subject to personal guarantees by Debtors. At the time of these events, the lease had been assigned, and as a condition of the assignment, Robert Kuske and Jackie Kuske ("Appellants") executed a guarantee of the lease in favor of the former lessee. At some point in time, the F.S.B. Company, Inc. ("Lessor"), another Washington corporation, obtained all or some of the original lessor's interest in the lease.

The lease was originally entered into on October 16, 1972, for a period of 20 years, commencing one month after completion of construction of the commercial building, which occurred on August 1, 1973. The lease was modified on August 24, 1976, and the termination date was changed to September of 1996.

■ The lease was what is commonly called a triple-net lease. It obligated Lessee to pay taxes and assessments, maintenance and repairs, insurance premiums and utilities; each in accordance with specific lease provisions.[2]

Under a separate provision for "Repair and Care of Premises and Payment of Taxes," the lease provided:

It is understood between the parties that this is a net net lease and Lessee shall be responsible to maintain the building in a good state of repair, reasonable wear and tear excepted, and at its own cost promptly make all necessary repairs, both interior and exterior, of said building.

---

F.2d 905, 906 (10th Cir.1990). This arrangement assures that the landlord will actually receive the lease's stated profits. *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 751 (2nd Cir.1991).

Lessee shall further be responsible for all taxes and assessments against said building and the land upon which the building is located during the term of this lease, and it shall be responsible for keeping said premises insured against fire and other hazard. . . .

The lease also had a separate section entitled "Utilities," whereby Lessee agreed to "pay all charges for heat, light, water and garbage" during the lease term.

Under the provision for "Rent," the lease provided for a monthly base rent of $1,400 together with a percentage of gross sales. The amount of base monthly rent was later modified to $2,229.

The "Default and Re–Entry" section provided that, upon default of rent payment or performance of any covenant, Lessor could sue for any deficiency upon reletting, or for the anticipated loss of reduced rentals, plus the cost of remodeling or renovation to relet the premises.

The restaurant business did not prosper and Lessee filed for reorganization under Chapter 11. The case was converted to Chapter 7; the Chapter 7 trustee rejected the unexpired lease effective September 1, 1992. Lessee abandoned the premises in August of 1992. At that time rents were current.

In October of 1993, Lessor presented a claim for expenses totaling $179,709.81. This included $70,488.81 in expenses incurred under the lease from August of 1992 through September of 1993. Some of these expenses were listed as follows:

a) building improvements,[3] $37,566.16

b) utilities, $3,529.76

c) repair and maintenance, $6,981.27

d) meals and entertainment, $18.80

e) remodeling, $45.71

f) insurance, $9,225.60

g) real estate taxes, $3,101.13

In addition, Lessor calculated total rent owed of $109,221. This was broken down as follows: 1) the rent owed from September of 1992 through October of 1993 (14 months), in the sum of $31,206; and 2) additional rent through the termination date of the lease (35 months) in the amount of $78,015.

The parties entered into settlement negotiations. During this time, Debtors filed for relief under Chapter 13. Thereafter, the parties agreed to settle the claim for $74,000, and payment was made by Appellants to the Lessor.

Appellants then filed an amended claim in the Debtors' bankruptcy case in the amount of $74,000. In support of their claim, Appellants submitted the declaration of Robert Kuske, in which he referred to the payments of insurance, taxes, utilities, and repairs and maintenance as "additional rent" to "bring the rent up to a reasonable price." All of those items of "additional rent" were to "maintain the value of the premises," he stated.

Debtors objected to allowance of the claim as exceeding the amount allowed by the Bankruptcy Code. Nevertheless, the declaration of Debtor Nolan McSheridan stated that the lease "was in 'triple net' form, requiring the Lessee to pay taxes, insurance, utilities and maintenance."

■ The bankruptcy court held a hearing on the matter; the parties stipulated that the issues at hearing would be limited to a determination of law as to what was or was not included in the term "rent reserved by such lease" as used in 11 U.S.C. § 502(b)(6)(A). The bankruptcy court issued its Order on Debtors' Amended Objection to Claim on May 23, 1994. The order provided that "the maximum amount of any claim based upon the lessor's damages resulting from termination of the lease" was $26,748, calculated as one year's rent at $2,229 per month pursuant to § 502(b)(6)(A). The order allowed Appellants an unsecured claim for $26,748. Thus, the bankruptcy court's order excluded

---

**3.** The declaration of Appellant Robert Kuske stated that the expense column designated as building improvements was a "misnomer" as those costs were for the replacement of the air conditioning system and the roof, which were in good

condition when Debtors took possession of the premises in 1985, but in 1993, the air conditioning unit was defective and could not be fixed, and the roof leaked in numerous places.

any expenses not designated as "rent" in the lease in the calculation of "rent reserved." [4] Appellants timely appealed the court's order.

## ISSUES

1) Whether, in a triple-net lease, the phrase "rent reserved by such lease" of § 502(b)(6)(A) includes other expenses not designated as "rent" or "additional rent."

2) Whether damages resulting from breach of covenants in a real property lease following rejection of the lease in bankruptcy are lease termination damages subject to the limiting provisions of § 502(b)(6)(A).[5]

## STANDARD OF REVIEW

Proper interpretation of statutory language is a question of law, subject to *de novo* review. *In re First Alliance Corp.*, 140 B.R. 531, 532 (9th Cir. BAP 1992).

## DISCUSSION

Appellants contend that under a triple-net lease the "rent reserved" under § 502(b)(6)(A) includes 12 months of base rent plus necessary repairs, maintenance, taxes, insurance and utilities and other necessary costs that accrued during the 12 months following abandonment of the leased premises. Thus, their maximum allowable claim for damages, calculable upon "rent reserved," should be greater than that allowed by the bankruptcy court, they contend. If the various expenses are not determined to be "rent reserved," then Appellants alternatively contend that damages arising from nonrental covenants are not subject to the statutory cap contained in § 502(b)(6)(A).

The Debtors disagree, and contend that only expenses designated as "additional rents" under the lease terms may be included in "rent reserved" for purposes of the calculation in § 502(b)(6)(A). They further contend that damages resulting from termination of a lease of real property encompass all aspects of the lessee's nonperformance of obligations under the lease.

### *"Rent Reserved" Under § 502(b)(6)(A)*

It is well settled that a lessor is entitled to assert a general unsecured claim for damages resulting from a debtor's rejection of a lease. §§ 365(g)(1), 502(g). Rejection of a lease in bankruptcy constitutes a breach of the lease. § 365(g). This claim is equally effective against a debtor as lessee or as guarantor of the lessee, as in this case. *In re Interco, Inc.*, 149 B.R. 934, 940 (Bankr. E.D.Mo.1993); *In re Farley, Inc.*, 146 B.R. 739, 745 (Bankr.N.D.Ill.1992).

Section 502(b)(6) limits the landlord's claim for damages, which is determined by state law, *In re Iron–Oak Supply Corp.*, 169 B.R. 414, 417 (Bankr.E.D.Cal.1994) (citing *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, (1979)), as well as by the terms of the lease or contract between the parties. *In re Financial News Network, Inc.*, 149 B.R. 348, 350 (Bankr.S.D.N.Y.1993).

Section 502(b)(6) provides, in pertinent part:

> (b) [T]he court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
> (A) The rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

---

4. The Panel has not been provided with a copy of the hearing transcript or the parties' stipulation as to issues in the record on appeal. The order itself does not elaborate on the basis for the order. Therefore, it is not evident to us whether the court concluded that only charges designated as "rent" or "additional rent" in the lease would be "rent reserved," or whether it determined that the other charges were not appropriately classi-

fied as rent. This is one reason for our remand order.

5. Although this issue was not one of the issues stipulated to be heard before the bankruptcy court, both parties raised it, and we will consider it because it is a matter of law and is supported by the record. *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1379 (9th Cir.1985).

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; ...

█ This provision is "grounded in principles of ratable distribution"; it balances the interests of landlords against those of other creditors by preventing landlords from receiving a windfall as a result of the filing of the bankruptcy petition. *In re Leslie Fay Companies, Inc.*, 166 B.R. 802, 808 (Bankr. S.D.N.Y.1994). Section 502(b)(6) is designed to compensate a landlord for the loss suffered upon termination of a lease, while not permitting large claims for breaches of long-term leases, which would prevent other general unsecured creditors from recovering from the estate. *In re Atlantic Container Corp.*, 133 B.R. 980, 985 (Bankr.N.D.Ill.1991). The legislative history of this provision indicates that it was considered equitable to limit the lessor's claims.

Historically, the limitation on allowable claims of lessors of real property was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove. Partly for this reason, claims of a lessor of real estate were not provable prior to the 1934 amendments to the Bankruptcy Act. Second, in a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease.

11 U.S.C. § 502; H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352–354 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess 62–65 (1978), Pub.L. No. 95–598, 1978 U.S.C.C.A.N. (92 Stat.) 5850.

Lessor's damages are calculable by using a formula that references the lease itself, specifically, the "rent reserved by such lease." *Financial News Network*, 149 B.R. at 351; § 502(b)(6)(A). The parties disagree on what constitutes "rent reserved" under their triple-net lease. While other jurisdictions have considered this issue, it appears to be a matter of first impression in the Ninth Circuit.

█ Unlike the ordinary simple transfer-of-possession lease, long-term leases, such as the one involved in this case, primarily serve the landlord's purposes for investment, financing, and tax minimization, while the tenant receives the long-term security needed for development of a business. *See* 2 POWELL ON REAL PROPERTY, § 17A at 17A–1 to 17A–2 (1994). While the ordinary "gross" lease imposes on the tenant only the obligation to pay rent, with the landlord retaining all the traditional burdens of ownership (including the obligation to pay taxes, municipal assessments, insurance premiums, and other maintenance costs), the long-term lease is almost invariably a "net" lease, which imposes these tax and maintenance obligations on the tenant. *Id.*

█ Rent has been defined as "the consideration paid for the use or occupation of property." George A. Pindar, AMERICAN REAL ESTATE LAW, § 11–58 at 462 (1976). At common law, rent referred to compensation or "return of value given at stated times" for the possession of lands. BLACK'S LAW DICTIONARY 1166 (5th ed. 1979). Washington law also generally recognizes the common meaning of rent. *See First Union Management, Inc. v. Slack*, 36 Wash.App. 849, 679 P.2d 936, 941 (1984) (landlord should not enlarge "ordinary meaning" of rent in double rent statute by including utility charges denominated as "additional rent" in the lease).

The Supreme Court has indicated in *dicta* that "rent reserved ... has some relationship to the value of the property and the value of the lease thereon." *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 455, 57 S.Ct. 298, 303, 81 L.Ed. 340 (1937).

Certain of these other obligations under a triple-net lease have been held to relate to the value of the real property or lease thereon, and, thus, have been regarded as "rent reserved" under § 502(b)(6)(A). *In re Heck's, Inc.*, 123 B.R. 544, 546 (Bankr. S.D.W.Va.1991) ("rent reserved" included minimum rent, real estate taxes, insurance, and common area maintenance fees, but did not include utility charges, janitorial expenses, new keys, electrical repairs and a new sign). In *Heck's*, the parties agreed that the lease was "triple net" and that "rent

reserved" would include the other charges, although the recitation of facts does not indicate whether the lease labeled those charges as "additional rent."

Accordingly, the bankruptcy court in *In re Farley, Inc.*, 146 B.R. 739 (Bankr.N.D.Ill. 1992) found that "rent reserved" in a triple-net lease included fixed and regular taxes, insurance premiums and annual capital improvement fee, but not general maintenance and "expenses of every kind." *Id.* at 741, 746–47.

The court in *Farley* held:

"Rent reserved" under 11 U.S.C. § 502(b)(6)(A) is any payment specifically denominated as rent. It includes any payments that relate directly to or increase the value or worth of the property, and are fixed, regular payments.

*Id.* at 746.

Although the lease in *Farley* did not expressly provide that the above expenses were "rent" or "additional rent," the lease stated: "It is the intention [of the parties] that the rent herein specified shall be net, net to the Landlord . . . ."

Appellants also cite *In re Goldblatt Bros., Inc.*, 66 B.R. 337, 339 (Bankr.N.D.Ill.1986). There, the lease included a clause which required the lessee to "make all repairs, alterations, replacements, additions, and improvements of every nature and description." *Id.* at 339. The opinion stated that the "rent reserved" consisted of fixed rent, common area maintenance expenses and real estate taxes assessed against the common areas, because only those charges were required as compensation for the use of the premises. *Id.* at 345. Remodelling and reconstruction costs were not included but were allowed in the total damage claim.

The case of *In re Conston Corp., Inc.*, 130 B.R. 449 (Bankr.E.D.Pa.1991), involved a lease with a specific provision for "additional rent" which included maintenance charges, taxes, insurance and utilities.

Finding authority for "fixed regular payments" to be regarded as rent, the bankrupt-

cy court in *Conston* concluded that two requirements had been met:

[A]ppendages to "pure" rent are allowable as "rent reserved" under § 502(b)(6) only if the lease expressly so provides *and* the charges in question are properly classifiable as rent because they are regular, fixed, periodic charges payable in the same way as "pure" rent.

130 B.R. at 455.

Recently, another bankruptcy court considered the two-part test of *Conston,* and held that it did not find the absence of an express rent label to be determinative. *In re Rose's Stores, Inc.*, 179 B.R. 789 (Bankr.E.D.N.C. 1995). Citing *Farley,* which was decided after *Conston,* the North Carolina bankruptcy court concluded:

The court in Farley stated that " '[r]ent reserved' under . . . § 502(b)(6)(A) is any payment specifically denominated as rent," but went on to say that such rent reserved also "includes any payments that relate directly to or increase the value or worth of the property, and are fixed, regular payments." Thus, despite the absence of a "rent" label in the lease, Farley held that amounts for taxes, insurance and the annual capital improvement fee were part of the rent reserved.

*Id.* at 790 (internal citations omitted).

The bankruptcy court rejected the *Conston* test in favor of its own two-part test:

First, the charge must be provided for in the lease as the tenant's obligation, though it need not be denominated as rent. Second, the charge must be related to the value of the property and the value of the lease thereon.

*Id.* at 791 (internal quotation omitted).

The court concluded that taxes and insurance and the common area maintenance charges were includable in "rent reserved," but that general maintenance and utilities were not because the latter charges related to the debtor's "use of the premises" rather than to the value of the property.[6] *Id.*

---

6. *Compare Goldblatt Bros.*, where the common area maintenance fee was considered "rent reserved" because it was required compensation

for the use of the premises. 66 B.R. at 345. Thus, the fee was related to the *value of the use* of the property. Value of the use of the property

Another recent case, examining whether a construction allowance designated as rent in a lease was "rent reserved," held that it was not. The bankruptcy court in *In re Gantos, Inc.*, 181 B.R. 903 (Bankr.W.D.Mich.1995) held:

> Although the Bankruptcy Code does not define rent reserved, several cases have recognized that it includes items payable under a lease that are (1) expressly labeled as rent in the lease and (2) classifiable as rent because the item is regular, fixed and periodically payable in the same manner as pure rent.

*Id.* at 907.

Landlords, particularly, like to cite a case from the 1930's, *In re United Cigar Stores Co. of America*, 86 F.2d 629 (2d Cir.1936), *cert. denied*, 300 U.S. 679, 57 S.Ct. 671, 81 L.Ed. 883 (1937), in which Judge Augustus Hand considered whether the cost of repair and maintenance "was by the terms of the lease a part of the 'rent.'" Judge Hand found that "[s]uch items are described in [the lease] as 'additional rent' and that 'these expenditures seem to us to have been made rent by agreement of the parties.'" *Id.* at 633.

Judge Hand further affirmed the nature of the charges as rent:

> It cannot be doubted that the "regular and specified rent," so called, was fixed with reference to the other burdens assumed by the tenant, as it is reasonable to suppose that the "regular" rent would have been larger if the tenant had not agreed to

assume the very substantial obligation of keeping the premises in repair.

86 F.2d at 633.

▇ We must disagree with an interpretation of *United Cigar Stores* that every covenant obligation which potentially reduces the regular rent should be considered as "rent reserved." Such a determination could conceivably apply to every covenant in the lease and would nullify the provisions of § 502(b)(6)(A), which was meant to cap the damages, not to encourage allowance of the entire damage claim. We prefer to view this case as one where the repair costs were so fixed and regular as to be considered additional rent. *See Id.* at 631.

▇ Reflecting on the above cases, it is apparent to the Panel that federal case law has caused the evolution of a test to determine rent reserved under § 502(b)(6)(A). It is also apparent that bankruptcy courts must make an independent determination of what constitutes "rent reserved" because labels alone may be misleading.[7]

▇ We hold that the following three-part test must be met for a charge to constitute "rent reserved" under § 502(b)(6)(A):

1) The charge must: (a) be designated as "rent" or "additional rent" in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;

2) The charge must be related to the value of the property or the lease thereon; and

---

would relate to the "the value of the property and the value of the lease thereon." *See Kuehner v. Irving Trust Co.*, 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1937). How is this fee different from general maintenance charges which are also required to be paid for the use of the premises? One can see how such analyses could lead to arguments that every provision in a lease is related to the value of the lease or the property; hence, the need for the factor of fixed and regular charges. See three-part test below.

7. The possibility that leases would be drafted with bankruptcy in mind by designating all charges as rent is hereby eliminated. Resolving the nonuniform treatment of landlord's claims in bankruptcy was a Congressional goal in drafting the forerunner of § 502(b)(6)—§ 63 a(9), enacted as subsection (7) by the 1934 Amendments to the

Bankruptcy Act of 1898, which made lessor's claims specifically provable, but only to the extent of one year's rent, or three years, in the case of corporate reorganizations under former § 77B(b)(10), also added in 1934. According to a seminal case, "In light of this history and purpose of the statutory provision and its clearly expressed intent, we should construe it so as to give it full force and effect, *and not allow it to be nullified by crafty draftsmanship in particular leases*." *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 920 (2nd Cir.1944) (emphasis added). The *Oldden* case was specifically approved in the legislative history of the present Bankruptcy Code. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 353–354 (1977), Pub.L. No. 95–598, 1978 U.S.C.C.A.N. (92 Stat.) 6309–10.

3) the charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.

■ If we examine the lease in the instant case, it did not make a specific provision for the charges, other than rent, to be "additional rent." On the other hand, the evidence showed that both parties intended to enter into a triple-net lease and that Lessee would be obligated to make the other payments in exchange for reduced rent. Thus, some of the charges may have been related to the value of the property or the lease. Furthermore, some of the charges might have been fixed and payable in a regular, periodic fashion like the regular rent. These determinations are for the bankruptcy court to make. Therefore, we remand to the bankruptcy court with instructions to conduct further proceedings in accordance with this disposition.

### Scope of § 502(b)(6)

Section 502(b)(6) provides that it applies to a "claim of a lessor for damages resulting from the termination of a lease of real property...." The parties do not dispute the fact that the lease has been terminated, since Lessee vacated the leased premises in August of 1992, and the premises were relet in early 1994.

Appellants contend that the enumerated expenses which they paid as guarantors of the lease resulted from Lessee's prepetition breach of covenants under the lease and, therefore, are not "termination" damages under § 502(b)(6). They argue that they are entitled to a separate claim for these damages.

Appellants cite § 63a(9) of the Bankruptcy Act, which specifically distinguished these two categories of damages:

The claim of a landlord for damages or injury resulting from the rejection of an unexpired lease of real property or for damages or indemnity under a covenant contained in such lease shall in no event be

allowed in an amount exceeding the rent reserved by the lease.

Section 502(b)(6) does not make the distinction.[8] Congress must have had some reason for omitting the reference for breaches of lease covenants, Appellants argue.

Appellants cite *Atlantic Container Corp.*, an Illinois bankruptcy case, which held that a claim for expenses incurred for repair and maintenance was not capped by § 502(b)(6). 133 B.R. 980 (Bankr.N.D.Ill.1991). In *Atlantic Container*, the landlords asserted, *inter alia*, prepetition damage claims for repair and maintenance costs resulting from physical neglect and damage to the property. The court found that the repairs and maintenance costs resulted from debtor's failure to fulfill its past obligations and were not related to the termination of the lease. It rested its conclusion on the "unclear text" of § 502(b)(6) and the failure of Congress to clarify whether by omitting in § 502(b)(6) the Bankruptcy Act's phrase "or for damages or indemnity under a covenant contained in such lease." The court concluded that damages from breach of lease covenants were to be separate and apart from the lease termination damages. *Id.*, 133 B.R. at 987.

> For purposes of this case, it is sufficient to note that the phrase "damages resulting from the termination of a lease" does not seem to contemplate the type of damages being sought here. The phrase suggests that § 502(b)(6) is intended to limit only those damages which the lessor would have avoided but for the lease termination. Any damages caused to the Premises by the Debtor's failure to fulfill its repair and maintenance obligations are unrelated to the termination of the lease.

*Id.*

The court also held that § 502(b)(6) was intended to limit claims for "prospective" damages and that the repair damages sought in that case had "nothing to do with the long-term nature of the leases" and the protection for other unsecured creditors contemplated in the legislative history of this code section. *Id.* at 988. The court held that it would

---

8. Another distinction between the old and new provisions is that § 63a(9) used the term "rejection" whereas § 502(b)(6) uses the word "termi-

nation." The parties do not dispute that the lease terminated as that term is used in § 502(b)(6).

reach the same result whether the claim was considered damages for breaches of covenants to repair and maintain or considered as unpaid past-due rent.[9] (The lease included a provision whereby, following default, the landlord could make the necessary repairs itself and charge the costs to the Lessee as "additional rent.")

This reasoning was followed to allow a separate claim for damages to the premises by the bankruptcy court for the District of North Dakota *In re Bob's Sea Ray Boats, Inc.*, 143 B.R. 229, 231 (Bankr.D.N.D.1992). The court stated that § 502(b)(6) "only includes damages anticipated to result from a tenant's failure to fill out the lease term. It does not address damages wholly collateral to the termination event." *Id.*

Despite the persuasiveness of the foregoing cases, the Panel does not believe that the damages for breach of covenants in this case is a separate claim from the termination damages in general. In addition, the claim arising from breach of the lease conceptually encompasses all time intervals and treats the claim as if the breach occurred immediately prior to the filing of the bankruptcy case. *See* § 502(g).[10]

Such an interpretation fulfills the purpose of "discharg[ing] the debtor from liability to future suits based upon the lease" and giving "a new and more certain remedy for a limited amount, in lieu of an old remedy inefficient and uncertain in its result." *Kuehner*, 299 U.S. at 453, 57 S.Ct. at 302 (construing former section 77B(b)(10) which limited landlord's claims for indemnity under a covenant in a lease made provable under § 63a of the Bankruptcy Act).

Recently, a bankruptcy court examined this issue in great depth. *See In re Mr. Gatti's, Inc.*, 162 B.R. 1004 (Bankr.W.D.Tex.

1994). It pointed out that the Bankruptcy Act also contained the following provision, which was to have been read in conjunction with capping provisions of § 63a(9). Former § 63c provided:

> Notwithstanding any state law to the contrary, the rejection of an executory contract or unexpired lease, as provided in this Act, shall constitute a breach of such contract or lease as of the date of the filing of the petition in bankruptcy. . . .

*Id.* at 1008.

Section 63a(9) of the Bankruptcy Act referred to the landlord's claim for damages or injury resulting from rejection, and the Bankruptcy Act provided and the Code still provides that rejection equals breach. *See* former § 63c and § 365(g). Congress clearly intended that a landlord's claim for any damages resulting from the rejection of the lease by the debtor, including any and all damages for breach of any covenants within the lease, was to be computed and allowed within the limits of former § 63a(9). *Id.*.

The Ninth Circuit Court of Appeals has held that when read together,[11] the following Code provisions are "part of a total scheme designed to set forth rights and obligations of landlords and tenants involved in bankruptcy proceedings." *In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir.1988).

Section 365(d)(3) provides for the performance under the lease by the trustee until the lease is assumed or rejected. Section 365(g) provides that rejection constitutes breach of the lease. Section 502(g) provides that a "claim arising from the rejection, under section 365 of this title . . . shall be allowed under subsection (a), (b) or (c) of this section" as a prepetition claim. Section 502(b)(6) further provides that a claim of a

---

**9.** Under § 502(b)(6)(B), unpaid rent due, without acceleration, on the earlier of the bankruptcy petition date or the date of repossession or surrender of the leased property, is fully allowed as part of the damage claim.

**10.** *See In re JAS Enterprises, Inc.*, 180 B.R. 210, 215 (Bankr.D.Neb.1995) (breach results in claim respecting three intervals of time: 1) time prior to filing of bankruptcy petition; 2) time between bankruptcy filing and 60 days post-petition; and

3) time beyond 60 days after the bankruptcy filing).

**11.** "[C]ourts must be wary not to examine one section of a statute in isolation because 'statutory construction . . . is a holistic endeavor.' " *In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 73 (Bankr. S.D.N.Y.1994) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988)).

lessor for damages resulting from the termination of a lease of real property shall be subject to the statutory cap. It is well-settled in the Ninth Circuit that "[by operation of law," the debtor's possessory interest in the lease terminates on the same date that it is rejected in bankruptcy. *In re Elm Inn, Inc.*, 942 F.2d 630, 633 (9th Cir.1991); *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1080–81 (9th Cir.1989); *In re Port Angeles Waterfront Assocs.*, 134 B.R. 377, 380 (9th Cir. BAP 1991); 11 U.S.C. § 365(d)(4) (if lease is deemed rejected, trustee shall "immediately surrender" such property).

 Reading these provisions as a whole, therefore, rejection of the lease results in the breach of each and every provision of the lease, including covenants, and § 502(b)(6) is intended to limit the lessor's damages resulting from that rejection. The damages are those resulting from nonperformance of the debtor's obligations under the lease. *Mr. Gatti's*, 162 B.R. at 1011. The distinction between past obligations under the lease and damages "caused" by the termination is incorrect because all damages due to nonperformance are encompassed by the statute.

Even courts which do not accept that rejection of a lease equates with termination would limit all of the landlord's damage claims pursuant to § 502(b)(6) because that is the section dealing with claims by a lessor against the estate in bankruptcy. *In re Austin Dev. Co.*, 19 F.3d 1077, 1082 n. 9 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 201, 130 L.Ed.2d 132 (1994); *Mr. Gatti's*, 162 B.R. at 1012–13; *In re Emple Knitting Mills, Inc.*, 123 B.R. 688, 691 (Bankr.D.Me. 1991).

The bankruptcy court did not err by limiting Appellants' total damage claim by the provisions of § 502(b)(6)(A).

### CONCLUSION

For nonrental charges in the triple-net lease to be "rent reserved" pursuant to § 502(b)(6)(A), they must meet the aforementioned three-part test. Furthermore, the provisions of § 502(b)(6)(A) encompasses damages arising from breach of any and all lease covenants upon termination of the lease. We **REMAND** for proceedings in accordance with this disposition.