# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: EL TORO MATERIALS
COMPANY, INC.,

*Debtor,*

SADDLEBACK VALLEY COMMUNITY
CHURCH,

*Appellant,*

v.

EL TORO MATERIALS COMPANY,
INC.,

*Appellee.*

No. 05-56164

BAP Nos.
CC-04-01287-PaBK
CC-04-01300-PaBK

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Klein, Brandt and Pappas, Bankruptcy Judges, Presiding

Argued and Submitted
June 7, 2007—Pasadena, California

Filed October 1, 2007

Before: Daniel M. Friedman,* Alex Kozinski and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Kozinski

---

*The Honorable Daniel M. Friedman, Senior United States Circuit
Judge for the Federal Circuit, sitting by designation.

13365

**COUNSEL**

Robert C. Braun, Penelope Parmes and Roger F. Friedman, Rutan & Tucker, LLP, Costa Mesa, California, for the appellant.

Ronald K. Van Wert, Robert K. Van Wert P.C., Costa Mesa, California, and William Malcom, Malcom & Cisneros, Irvine, California, for the appellee.

**OPINION**

KOZINSKI, Circuit Judge:

Bankruptcy presents a unique challenge: How should a paucity of resources be allocated to cover a multiplicity of claims? Distributing money to satisfy claims is, in most cases, a zero-sum game: Every dollar given to one creditor is a dollar unavailable to satisfy the debt owed to others. For Paul to be paid in full, Peter must be short-changed. Congress sought to balance the interests of competing creditors through an extensive set of rules organizing, prioritizing and structuring claims against the estate. *E.g.*, 11 U.S.C. § 507(a) (prioritizing claims); *id.* § 502(e)(1) (disallowing claims for reimbursement or contribution); *id.* § 502(b)(1)-(5), (7)-(9) (limiting or disallowing various claims).

The bankruptcy estate of mining company El Toro Materials hopes to use one of these rules—a cap on damages "resulting from the termination of a lease of real property," *id.* § 502(b)(6)—to limit its liability for allegedly leaving one million tons of its wet clay "goo," mining equipment and other materials on Saddleback Community Church's property after rejecting its lease.[1] Saddleback brought an adversary proceeding against El Toro claiming $23 million in damages for the alleged cost of removing the mess, under theories of waste, nuisance, trespass and breach of contract. The bankruptcy court, on a motion for partial summary judgment, found that Saddleback's recovery would not be limited by the section 502(b)(6) cap. On certified cross-appeal the Bankruptcy Appellate Panel (BAP) reversed, holding that any damages would be capped. Saddleback appeals.

\* \* \*

Claims made by landlords against their bankrupt tenants for lost rent have always been treated differently than other unsecured claims. Prior to 1934, landlords could not recover at all for the loss of rental income they suffered when a bankrupt tenant rejected a long-term lease agreement; future lease payments were considered contingent and thus not provable debts in bankruptcy. *See Manhattan Props., Inc.* v. *Irving Trust Co.*, 291 U.S. 320, 332-36, 338 (1934).

The Great Depression created pressure to reform the system: A wave of bankruptcies left many landlords with broken long-term leases, buildings sitting empty and no way to recover from the estates of their former tenants. *See Oldden* v. *Tonto Realty Corp.*, 143 F.2d 916, 919-920 (2d Cir. 1944). On the one hand, allowing landlords to make a claim for lost rental income would reduce the harm done to them by a ten-

---

[1]The parties entered into a stipulation that the lease would be rejected under 11 U.S.C. § 365(a) (allowing bankrupt tenants to reject the remaining term of leases).

ant's breach of a long-term lease, especially in a down market when it was difficult or impossible to re-lease the premises. On the other hand, "extravagant claims for . . . unearned rent" could quickly deplete the estate, to the detriment of other creditors. *See In re Best Prods. Co.*, 229 B.R. 673, 676 (Bankr. E.D. Va. 1998). The solution was a compromise in the Bankruptcy Act of 1934 allowing a claim against the bankruptcy estate for back rent to the date of abandonment, plus damages no greater than one year of future rent. *See Oldden*, 143 F.2d at 920-21.

**[1]** Congress dramatically overhauled bankruptcy law when it passed the Bankruptcy Reform Act of 1978. However, section 502(b)(6) of the 1978 Act was intended to carry forward existing law allowing limited damages for lost rental income. S. Rep. No. 95-989, at 63 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5849 (the cap on damages is "derived from current law"). Only the method of calculating the cap was changed. Under the current Act, the cap limits damages "resulting from the termination of a lease of real property" to "the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease." 11 U.S.C. § 502(b)(6). The damages cap was "designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." S. Rep. No. 95-989, at 63.

**[2]** The structure of the cap—measured as a fraction of the remaining term—suggests that damages other than those based on a loss of future rental income are not subject to the cap. It makes sense to cap damages for lost rental income based on the amount of expected rent: Landlords may have the ability to mitigate their damages by re-leasing or selling the premises, but will suffer injury in proportion to the value of their lost rent in the meantime. In contrast, collateral damages are likely to bear only a weak correlation to the amount of rent: A tenant may cause a lot of damage to a premises

leased cheaply, or cause little damage to premises underlying an expensive leasehold.[2]

[3] One major purpose of bankruptcy law is to allow creditors to receive an aliquot share of the estate to settle their debts. Metering these collateral damages by the amount of the rent would be inconsistent with the goal of providing compensation to each creditor in proportion with what it is owed. Landlords in future cases may have significant claims for both lost rental income and for breach of other provisions of the lease. To limit their recovery for collateral damages only to a portion of their lost rent would leave landlords in a materially worse position than other creditors. In contrast, capping rent claims but allowing uncapped claims for collateral damage to the rented premises will follow congressional intent by preventing a potentially overwhelming claim for lost rent from draining the estate,[3] while putting landlords on equal footing with other creditors for their collateral claims.

[4] The statutory language supports this interpretation. The cap applies to damages "resulting from" the rejection of the lease. 11 U.S.C. § 502(b)(6). Saddleback's claims for waste, nuisance and trespass do not result from the rejection of the lease—they result from the pile of dirt allegedly left on the property. Rejection of the lease may or may not have triggered Saddleback's ability to sue for the alleged damages.[4] But the harm to Saddleback's property existed whether or not the lease was rejected. A simple test reveals whether the damages result from the rejection of the lease: Assuming all other

---

[2]Here, El Toro is alleged to have caused $23 million of damage to a property that it leased for only $28,000 per month.

[3]The structure of the cap suggests congressional concern about damages from long-term leases spanning many years: The cap maxes out at 15% of 20 years, or 3 years' rent. A claim for lost rent for a full 20 years would in many cases overwhelm any other claims against the estate.

[4]We need not, and do not, decide whether Saddleback could have brought its claims before the lease terminated.

conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it? Here, Saddleback would still have the same claim it brings today had El Toro accepted the lease and committed to finish its term: The pile of dirt would still be allegedly trespassing on Saddleback's land and Saddleback still would have the same basis for its theories of nuisance, waste and breach of contract. The million-ton heap of dirt was not put there by the rejection of the lease—it was put there by the actions and inactions of El Toro in preparing to turn over the site.[5]

Interpreting the section 502(b)(6) cap to include damage collateral to the lease would also create a perverse incentive for tenants to reject their lease in bankruptcy instead of running it out: Rejecting the lease would allow the tenant to cap its liability for any collateral damage to the premises and thus reduce its overall liability, even if staying on the property would otherwise be desirable and preserve the operating value of the business. Bankrupt tenants—especially those who have damaged the property and thus may face liability upon expiration of the lease—would pack up their wares[6] and reject otherwise desirable leases in order to gain the benefit of capping unrelated damages. This would both reduce the operating value of the business and deny recovery to a creditor—a lose-lose situation counter to bankruptcy policy. An incentive to sacrifice efficiency in order to exploit a loophole in the liability-capping provisions would be plainly counter to congressional intent to maximize the value of the estate to creditors.

---

[5]Our ruling is consistent with *K-4, Inc.* v. *Midway Engineered Wood Prods., Inc.* (*In re Treesource Indus., Inc.*), 363 F.3d 994 (9th Cir. 2004). There, we determined the priority of a claim for failure to remove materials from the premises, *id.* at 995, whereas today we decide whether similar claims are capped by the section 502(b)(6) limitation. Prioritization of the claim is a separate issue from determining the amount of the claim that will be permitted.

[6]Or fail to pack them up at all, as is alleged here.

Further, extending the cap to cover any collateral damage to the premises would allow a post-petition but pre-rejection tenant to cause any amount of damage to the premises—either negligently or intentionally—without fear of liability beyond the cap. If the tenant's debt to the landlord already exceeded the cap then there would be no deterrence against even the most flagrant acts in violation of the lease, possibly even to the point of the tenant burning down the property in a fit of pique. Absent clear statutory language supporting such an absurd result, we cannot suppose that Congress intended it.

[5] The BAP reached a contrary conclusion because it considered itself bound by its precedent in *Kuske* v. *McSheridan (In re McSheridan)*, 184 B.R. 91 (B.A.P. 9th Cir. 1995), and therefore held that Saddleback's recovery against El Toro would be capped under section 502(b)(6).[7] To the extent that *McSheridan* holds section 502(b)(6) to be a limit on tort claims other than those based on lost rent, rent-like payments or other damages directly arising from a tenant's failure to complete a lease term, it is overruled.[8]

---

[7]Two of the three judges on the appellate panel filed concurring opinions in which they expressed reservations about *McSheridan*, going as far as to foreshadow that "it may be doubted that [*McSheridan*] . . . would survive scrutiny by the court of appeals." *El Toro Materials Co.* v. *Saddleback Valley Cmty. Church (In re El Toro Materials Co.)*, No. CC-04-01287, slip op. at 31 (B.A.P. 9th Cir. July 8, 2005) (Klein, J., concurring in result). When the panel believes that one of its precedents is wrongly decided or otherwise deserves reconsideration, the goal of judicial efficiency may be best served by allowing the BAP itself to overrule its own precedent. The BAP, promulgating its rules under supervision of the Ninth Circuit Judicial Council, has not yet implemented a rule creating an en banc procedure. *Cf. Textile Mills Sec. Corp.* v. *Comm'r of Internal Revenue*, 314 U.S. 326, 335 (1941) (statutory authorization for three-judge panels in the courts of appeals did not preclude the Third Circuit from instituting the "more effective" procedure of hearing select cases en banc). As this case suggests, the time may be ripe for the BAP to consider instituting such a procedure.

[8]*McSheridan* also holds that damages flowing from the failure of a party that has rejected a lease to perform future routine repairs or pay utility bills are capped. 184 B.R. at 95, 102. As the tort claims at issue here are not based on a failure to perform routine maintenance, we do not address the propriety of that holding.

Saddleback's argument that section 502(b)(6) does not cap its claim for damages is properly raised before us; Saddleback did not waive the argument by failing to question the breadth of the section 502(b)(6) cap in its cross-appeal from the bankruptcy court to the BAP, as the ruling of the bankruptcy court on this issue was entirely favorable to Saddleback. Saddleback had no reason to challenge a favorable decision.

We remand for a determination on the merits of Saddleback's claim.

**REVERSED and REMANDED.**