**DEWEY RANCH HOCKEY, LLC.**

**No. 2:09–bk–09488–RTBP.**

United States Bankruptcy Court,
D. Arizona.

Under Advisement: June 9, 2009.

Date Ruled Upon: June 15, 2009.

Edward M. Zachary, Bryan Cave LLP, Kelly Singer, Thomas J. Salerno, Squire Sanders & Dempsey LLP, Phoenix, AZ, for Dewey Ranch Hockey, LLC.

## MINUTE ENTRY/ORDER FOR MATTER TAKEN UNDER ADVISEMENT

REDFIELD T. BAUM, Bankruptcy Judge.

Pending before the court is the "Motion of the Debtors for an Order under Sections 105(a), 363, and 365 of the Bankruptcy Code (I) Authorizing Coyotes Hockey, LLC's sale of substantially all of its assets, free and clear of liens, claims, and encumbrances, subject to higher and better offers, and (ii) approving an Asset Purchase Agreement" ("APA"), (the "Motion"). The Motion seeks authority to sell the Phoenix Coyotes, a National Hockey League ("NHL") franchise and to allow the buyer to relocate that franchise to Hamilton, Ontario in Canada without the consent of the NHL. The motion is opposed by the NHL, the City of Glendale, Arizona ("Glendale") and Aramark Sports and Entertainment Services, LLC ("Aramark"), a creditor of the Debtors. As explained below, the Motion is denied, without prejudice.

The four Debtors filed their chapter 11 petition on May 5, 2009. Also on that date, the Debtor, Coyotes Hockey, LLC, as the seller, signed the APA with PSE Sports & Entertainment LP ("PSE"), as the buyer, the Debtors filed the Motion, and the Debtors filed a motion to establish the procedures for the sale and auction (including approval of a termination fee [1] to PSE) of the Phoenix Coyotes. The APA key terms provide that (1) PSE will pay a total purchase price of $212,500,000.00 in cash, (2) up to $22,500,000.00 of the purchase price will be paid to Wayne Gretzky, the coach and a minority owner, pursuant to his contract unless otherwise agreed, (3) PSE will deposit $20,000,000.00 in escrow, (4) the bankruptcy court order approving the sale expressly providing that the "home games to be played at the location of Buyer's choice in Southern Ontario, Canada" regardless of the lack of consent or agreement of the NHL and its members, and (5) the agreement terminates on June 29, 2009, if the requisite bankruptcy court sale order has not been entered.

## I. EVENTS AND CIRCUMSTANCES PRIOR TO BANKRUPTCY

The facts and circumstances leading up to these bankruptcies and the Motion are

1. At the initial hearing before the court and after the comments by the, PSE withdraw its request for a termination fee based upon the right to file an administrative claim related to its costs incurred regarding the APA. *See In re O'Brien Environmental Energy Inc.,* 181 F.3d 527 (3rd Cir.1999).

essential to understanding and considering the parties' present positions and assertions. The Phoenix Coyotes moved to Arizona in 1995 and until December 2003 played their home games in the same arena as the Phoenix Suns of the National Basketball Association. In approximately 2001, Jerry Moyes ("Moyes") became an investor in the Phoenix Coyotes. In November 2001, some of the Debtors and Glendale entered into the "Arena Management, Use and Lease Agreement". Pursuant to that Arena Agreement, Glendale built a new hockey arena for the Coyotes in Glendale, Arizona. The Phoenix Coyotes played its first home game in that arena in December 2003 and have played all of its home games there through the end of the current regular 2009 season.

Glendale's plan was that the arena would be a multi-use sports and entertainment facility serving as the main feature of a planned 223 acre $1 billion development known as Westgate City Center. The principal developer for that project was Steve Ellman the then controlling owner of the Phoenix Coyotes. To build the arena, Glendale advanced $183 million. Glendale issued bonds to raise approximately $155 million of that amount. To protect Glendale's investment and planned development, the Arena Agreement provided, in principal part, that (1) the Phoenix Coyotes would play all of its home games at the arena through 2035, (2) Glendale had the right to seek specific performance to play the home games at the arena, and (3) the damages to Glendale if the agreement was terminated early and the specific performance right granted to Glendale was not available would be a "liquidated damages amount" calculated by a complex formula starting at $794,663,034.00 with spec-

ified reductions, which were essentially tied to revenues received and adjusted for the remaining term of the Arena Agreement. Glendale projected that over the thirty year term of that agreement it would realize $795 million in various taxes and fees from the development of the arena and Westgate City Center.

Pursuant to a 2003 agreement with the Debtors, Aramark[2] became the exclusive manager of all of the concession operations at the arena. Under that agreement, Aramark paid $8,000,000.00 to build, equip and furnish the concession premises at the arena. The agreement provides that if the Phoenix Coyotes relocate, Aramark will be paid a termination payment which it asserts is currently $5,095,022.00. Further, Aramark claims it is owed an additional approximate amount of $40,000.00 for services provided to the Debtors.

In 2006, Ellman and various of his entities, on the one hand, and Moyes and various of his entities, on the other hand, and others including the NHL entered into a Consent Agreement. That agreement dealt with many aspects of the then agreements between those two parties. For purposes of this dispute, the essential aspect of the Consent Agreement was that the Moyes group became the controlling owner of the Phoenix Coyotes and the Ellman group relinquished all of their interest in the Phoenix Coyotes.

By the summer of 2008, the Phoenix Coyotes were in serious financial trouble. The Moyes group had advanced over $300 million to operate the Phoenix Coyotes. The operations sustained annual financial losses in excess of $36 million in 2006, 2007, and 2008. At the request of the Moyes group, the NHL began advancing

---

2. Aramark asserts that is has other similar agreements with other major league sports teams.

funds for the operations in August 2008, which advances were to be repaid from the Phoenix Coyotes' share of future shared league revenues. Beginning in the fall of 2008, various meetings occurred involving the Moyes group, the NHL, Glendale and others regarding the financial problems of the Phoenix Coyotes and means to resolve those problems. Glendale was requested to make economic concessions but did not offer any meaningful concessions. In 2009, the Moyes group prepared a confidential investor memorandum and later a private placement memorandum for potential purchasers of the Phoenix Coyotes and commenced seeking a purchaser(s) and/or investor(s) for the Phoenix Coyotes. The NHL, through its Commissioner, Deputy Commissioner and others were also actively seeking new owner(s) or new investor(s).

Throughout this time period, the NHL continued funding the operational shortfall of the Phoenix Coyotes. In April 2009, Earl Scudder of the Moyes group advised Commissioner Bettman that there was interest by a purchaser from Canada who wanted to move the team to Southern Ontario. Bettman told Scudder that he wanted the team to stay in Glendale and that there would be no relocation to Southern Ontario because that was the NHL's territory. These parties do not agree on the entire substance of the balance of that conversation. On the day the bankruptcy petitions were filed, May 5th, the Commissioner and Deputy Commissioner flew to Phoenix to present a letter of intent for the purchase of the Phoenix Coyotes and the arena rights, which letter of intent assumed significant modifications to the agreements with Glendale.

## II. THE PARTIES' POSITIONS REGARDING THE MOTION

The documents evidencing the rights and obligations of the thirty member teams of the NHL require that any transfer of ownership or relocation can only be made with the consent and approval of the NHL. Prior to signing the APA, neither the Debtor nor PSE submitted the requisite applications to the NHL for it to approve either the change in ownership or location of the Phoenix Coyotes. Further, such requests were not informally made to the NHL. The NHL objects to both the change in ownership and relocation because it has not consented to either action. The NHL also asserts that the court does not have the power to order either action over its objection.

More specifically, the NHL asserts that (1) the league member agreements and documents must be assumed and assigned in their entirety including, but not limited to, the requirement to apply for and obtain its consent to any change in ownership or relocation, (2) the Motion and related pleading do not establish adequate protection of the league's interests, cure the default created by signing the APA, and compensate the NHL for the damages it will suffer if the Motion is granted, and (3) there is no bona fide dispute of the interests of the NHL in the Phoenix Coyotes. Lastly, the NHL asserts that granting the Motion would "wreak havoc" in the professional sports industry and, therefore, the Bankruptcy Code was not intended to and should not be used to cause such devastation to the very significant economic benefits generated by these leagues.

Glendale asserts that its specific performance rights granted by the Arena Agreement and consistent with state law are not subject to the sale free and clear power authorized under Section 363 and that it can not be adequately protected as the Bankruptcy Code requires. Glendale also asserts that its specific performance

rights are not subject to rejection under Section 365. Lastly, Glendale asserts that rejection of the Arena Agreement is not in the best interests of the creditors and the estate, and must be denied.

Aramark filed a statement of position regarding the sale contemplated by the Motion. The statement is subtle in terms of not expressly objecting to or supporting the sale. However, the court considers the statement as an objection given the termination fee claimed and the statements regarding the effect of a sale and relocation on major sports leagues' venues.

The Official Unsecured Creditors' Committee ("OUCC") generally supports the Motion because the committee has concluded that the sooner there is a sale/auction the better the chances of the greatest recovery for the unsecured creditors. The OUCC did not unconditionally support the sale contemplated by the Motion and reserved its right for the auction hearing.

Moyes claims that he holds unsecured claims of approximately $100,000,000.00. Unsurprisingly, he supports the sale because he considers it in the best interests of the creditors and provides the greatest return to the creditors.

The National Basketball Association, the National Football League, and the Office of the Commissioner of Baseball have collectively filed an amici curiae brief supporting the position of the NHL. They join with the NHL regarding the asserted right of professional sports leagues to approve owners of and locations of the members of those leagues; and that the powers in the Bankruptcy Code either do not allow or should not be used to evade such requirements.

The Debtors and PSE assert that using the powers granted the court under Sections 363 and 365 of the Bankruptcy Code, the court can sell the Phoenix Coyotes to PSE and authorize the relocation of the Phoenix Coyotes to Ontario, Canada, free and clear of any claims of any creditor including, but not limited to, the claims and objections of the NHL and Glendale. Additionally, on May 7, 2009, Coyotes Hockey, LLC filed an adversary proceeding against the NHL in this court alleging various antitrust claims seeking, in part, an injunction against the NHL from enforcing its transfer and relocation terms due to the alleged antitrust violations; an amended complaint was filed on June 4, 2009. The record does not show that service of that complaint was been made on the NHL. In late May 2009, PSE submitted applications to the NHL requesting approval of the ownership transfer to PSE and of the relocation to Ontario, Canada.

## III. ANALYSIS AND DISCUSSION

Because this appears to be the first case under the Bankruptcy Code ("Code") where a professional sports team seeks to use the rights contained in the Code to force a sale and relocation of a team, the Motion presents novel and unique issues to the bankruptcy court. The legal issues trigger not only bankruptcy law, but antitrust law and commercial law in the context of a professional sports team, as a chapter 11 debtor, which team has for years incurred, and is continuing to incur, very serious financial losses and problems. No cases have been found that precisely or even closely fit this scenario. The essence of the Motion by the Debtors, and supported by PSE, is the joint use of Sections 363 and 365 of the Code to authorize the assumption and assignment of the Debtor's executory contract with the NHL but "excising" or barring enforcement of the NHL's consent requirements for transferring ownership of a team and for relocating a team; together with the authority to sell estate property free and clear of any claims and interests of others if such

claims/interests are either not enforceable under nonbankruptcy law or "in bona fide dispute".

## A. The Section 365 Assumption and Assignment Issues

■ Section 365(f)(1) authorizes the assumption and assignment of an executory contract "notwithstanding a provision in an executory contract . . . or in applicable law, that prohibits, restricts, or conditions the assignment of such contract . . .". The Debtors and PSE focus on this provision of Section 365. Of course, any assumption and assignment of an executory contract must satisfy the other statutory requirements of Section 365. The Ninth Circuit has upheld the application of Section 365(f) to invalidate a claimed default under a court approved assumption and assignment of an executory contract based upon a change of ownership provision as an unenforceable anti-assignment clause. *See In re Crow Winthrop Operating Partnership*, 241 F.3d 1121 (9th Cir.2001). In so doing that court stated:

> We look beyond the literal wording of a contractual provision to see whether it operates as a de facto anti-assignment clause in violation of § 365(f). . . . Consequently, Crow Operating would be prevented from realizing the full value of its assets, in conflict with a fundamental bankruptcy policy. . . . Therefore, we conclude that the change in ownership provision was properly denied effect under § 365(f) as a de facto anti-assignment clause.

*Id.* at 1124. In *Crow*, the agreement at issue dealt with the rights to parking and management of common areas relating to adjacent parcels of real property originally owned by affiliated entities. There are numerous bankruptcy cases from many jurisdictions in a variety of factual settings that rely on these provisions of Section

365(f) to not enforce contract terms effectively barring assignment. Significant to the court here regarding the objection to the transfer of ownership of the Phoenix Coyotes is the fact that in 2006 the NHL approved PSE to become a member of the NHL. The court has the firm sense that if the only issue here was PSE purchasing the Phoenix Coyotes [no relocation term] there would be no objection from the NHL. The law implies in every contract a covenant of good faith and fair dealing. Even where one party retains, by virtue of the contract, a right of approval or disapproval or a discretionary power over the right of the other, such powers must be exercised within the parameters of the duty of good faith. *Los Angeles Memorial Coliseum Com'n v. National Football League*, 791 F.2d 1356, 1361 (9th Cir.1986) (hereinafter *"Raiders II"*). Absent some showing by the NHL that there have been material changes in PSE's circumstances since 2006, it appears to the court that the NHL can not object or withhold its consent to PSE becoming the controlling owner of the Phoenix Coyotes. Therefore and based upon this record, the court concludes that the NHL can not declare a default solely due to the change in ownership terms of the APA.

■ However, Section 365 has other requirements to assume and assign an executory contract. Section 365 generally requires three acts to assume an executory contract: (1) curing of enforceable default(s), (2) compensation for any actual pecuniary loss resulting from such default(s), and (3) providing adequate assurance of future performance.

■ The far greater challenge for the Debtors and PSE is to establish that the relocation provision of the APA is unenforceable as a de facto anti-assignment or is otherwise unenforceable under Section 365. In that regard, one of the es-

sential requirements for assumption and assignment is the Section 365(b)(1)(c) requirement of "adequate assurance of future performance under such contract". To reiterate the obvious, such contract at issue here, i.e., the Debtors' agreement with the NHL, requires the Phoenix Coyotes to play all its home games in the arena in Glendale. It is basic bankruptcy law regarding the assumption and assignment of executory contracts that the assuming party can not assume only the benefits of a contract; rather assumption is the entire agreement, benefits and burdens. *See* 3 Collier on Bankruptcy ¶ 365.03[1], at p. 365–24 (15th ed. rev. 2007). The Debtors and PSE assert that the location requirement to play all home games in the Glendale arena is an unenforceable provision in the contract that "prohibits, restricts, or conditions the assignment" under Section 365(f); and thus can be excised from the contract under existing case law. There are a some reported decisions allowing franchises to be relocated short distances within the area of their existing business without the consent or over the objection of the franchisor; excising such restriction from the contract. However, there are no reported bankruptcy court decisions ordering a relocation of the magnitude proposed here based on these provisions in the Bankruptcy Code. Initially and as noted above, the geographic restriction here is part of the executory contract sought to be assumed by the Debtors. The assertion here is akin to a purchaser of a bankrupt franchise in a remote location asserting that it can be relocated far from its original agreed site to a highly valuable location, for example to New York

City's Times Square, because the contractual geographic requirement/limitation is a restriction, prohibition, or condition precluding assignment. The court does not consider the provision establishing the Debtors' location obligation as a term prohibiting, restricting or conditioning the assignment of the agreement as those terms are used in Section 365. Simply put, this court disagrees with the assertions by the Debtors and PSE that the relocation requirement can be excised from the "contract" because it violates some portion of Section 365 [anti-assignment or other term] or is unlawful under the anti-trust claims[3] alleged by the Debtors and also advocated by PSE.

■ As discussed at the hearing, the Motion does not address the apparent right of the NHL to compensation for the expansion opportunity for the proposed move to Ontario, Canada. *See Raiders II*, 791 F.2d at 1371 ["the NFL as a whole owned the right to expand into the Los Angeles area"]. This court does not consider the statements in *National Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562 (9th Cir.1987) (hereinafter "*SDC Basketball Club*") as changing that right. It appeared to the court that at the hearing, the Debtors and PSE recognized this obligation. While recognizing that such apparent right does not fit precisely into the provisions of Section 365, the court concludes that either the requirement of adequate assurance of future performance or of compensation for any actual pecuniary loss resulting from a default dictates that this apparent economic right of the NHL must be appropriately resolved for the Motion to satisfy the requirements of Section 365.[4]

---

**3.** The court addresses the anti-trust claims later in this decision. That discussion is equally applicable here.

**4.** It was suggested by some parties at the hearing that the parties should attempt to resolve the relocation issue by mediation; if the parties are willing to mediate this and the

## B. The Section 363 Sale Free and Clear Issues

The Debtors and PSE also assert that the court's sale powers found in Section 363 of the Code authorize the sale and relocation of the Phoenix Coyotes to Ontario, Canada free and clear of the geographic limitation in the agreements and notwithstanding the objection and/or lack of consent of the NHL. Specifically, they rely upon Section 363(f)(1) & (4). Section 363(f)(1) allows a sale free and clear of other's interests therein where "applicable nonbankruptcy law permits sale of such property free and clear of such interest". Section 363(f)(4) allows a sale free and clear where "such interest is in bona fide dispute". Both the Debtors and PSE assert that the antitrust action and claims they have collectively presented satisfies either or both of these standards. As noted above, two days after filing their bankruptcy petitions, the Debtors filed an adversary proceeding against the NHL alleging various antitrust claims and asserting that they were entitled to injunctive relief enjoining the NHL from enforcing either its transfer or relocation restrictions regarding the sale to PSE and the relocation of the Phoenix Coyotes to Ontario, Canada.

Based upon the extensive portions of the briefs by both the Debtors and PSE regarding the antitrust issue(s), the court has the strong sense that both parties believe that this is their most compelling argument on the "relocation issue". While recognizing that it is difficult to address antitrust issues briefly, the Ninth Circuit has decided several antitrust cases involving relocation of professional sports teams without the consent or over the objection of the league which decisions guide this court in considering these assertions.

The seminal decision was the injunction in 1982 barring the NFL and its member clubs from interfering with the transfer of the Oakland Raiders to Los Angeles. *See Los Angeles Memorial Coliseum Com'n v. National Football League,* 726 F.2d 1381 (9th Cir.1984). In affirming the injunction and the jury's liability verdict (which damage award was later vacated) against the NFL, the court reached several conclusions which are important here. They are: (1) it is a difficult task to analyze the negative and positive effects of a business practice in an industry which does not readily fit into the antitrust context; (2) collective action in areas such as league divisions, scheduling and rules must be allowed, as should other activity that aids in producing the most marketable product attainable; (3) the unique structure of the NFL product precludes the application of the per se antitrust rule; and (4) to withstand antitrust scrutiny, restrictions on team movement must be closely tailored to serve the needs inherent in producing the NFL product. The "Raiders case" involved a second decision by the Ninth Circuit regarding the damage claims of the Coliseum and the Raiders. *See Raiders II,* 791 F.2d 1356. In *Raiders II* the court vacated the damage award to the Raiders and remanded the case to the trial court. The court did so because the lower court improperly limited the NFL's offset defense to the damage claim when it excluded from the jury's consideration the benefit the Raiders realized by taking from the NFL its opportunity to establish an expansion franchise in Los Angeles. Stated differently, the NFL as a whole owned the right to expand into the Los Angeles area. When the Raiders moved there it took that right from the NFL. In determining the Raider's damages, the jury should have

related issues, the court encourages, as strongly as it can, to do so; sooner rather than later.

considered "the value of the NFL's Los Angeles expansion opportunity in 1980, prior to the NFL's illegal conduct, less the value of the Oakland opportunity returned to the league". *Raiders II* at 1372.

Following these decisions, the Ninth Circuit again confronted antitrust claims regarding professional sports league rules on relocations in *SDC Basketball Club*, supra, 815 F.2d 562. In that case, the then San Die go Clippers simply announced that they were moving to Los Angeles and did so. The NBA sued seeking a declaratory judgment that it could restrain the movement and that it could impose a charge for usurping the franchise opportunity taken by the Clippers but claimed by the NBA. That court also reached several conclusions important here. First, that for purposes of antitrust claims, professional sports league franchise movement restrictions are not invalid as a matter of law. Second, the question of what restraints are reasonable is one of fact. *See also American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir.1996) [antitrust cases consist primarily of factual issues]. Third, the mere existence of terms and conditions for franchise relocations cannot violate antitrust law.

 With this brief but important overview of applicable antitrust law regarding the effect of restrictions on team's relocations, the court turns to the assertions by the Debtors and PSE. They argue that there is either applicable nonbankruptcy law (antitrust case law) which permits this sale under Section 363(f)(1) or there exists a bona fide dispute under Section 363(f)(4) either or both of which allows the sale and relocation of the hockey franchise to Ontario, Canada free and clear of the claims of the NHL. After reviewing a number of "bona fide dispute" decisions, the rationale for the conclusion that there was a bona fide dispute has, at times, been less than clear by some courts.

However, there is controlling case law to guide this court. *See In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057 (9th Cir. 2002). That court established the objective test for determining if a bona fide dispute existed. That test requires the court to determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the claim. That court also stated that the "mere existence of pending litigation or the filing of an answer is insufficient to establish the existence of a bona fide dispute". *Id.* at 1066. That court, in finding that the claims were subject of bona fide dispute, did so after carefully analyzing the significant factual and legal history of those disputes.

By comparison with the situation here, there is no factual or legal history for the court to analyze. Additionally, it is uncertain that applicable nonbankruptcy law, here antitrust law, permits this sale. *See Raiders II* at 1373 ["the nature of NFL football requires some territorial restrictions in order both to encourage participation in the venture and to secure each venturer the legitimate fruits of that participation"]. Until the antitrust action was filed on May 7th, the record is barren of any assertion by the Debtors, PSE or anyone else that there were any antitrust issues or claims. The statement in Vortex is telling that the mere existence of pending litigation is insufficient to establish a bona fide dispute. It is also significant to this court that a relocation application was first filed with the NHL by the Debtors/PSE only after this court's comments during the May 19th hearing relating to the fact that the parties had not asked the NHL for approval and the importance of actually making such request based upon the decisions in *Raiders II*, when compared to *Sullivan v. National Football League*, 34 F.3d 1091, 1110 (1st Cir.1994) [that court in vacating the judgment for Sullivan and remanding for a new trial

stated that "The failure of Sullivan to request a vote is a critical and potentially dispositive issue in this case"]. A significant portion of the briefs, declarations, and arguments by the Debtors and PSE is the claim that under the "as applied" standard in the antitrust cases the actions of the NHL violate antitrust law. The fundamental problem with those assertions is that the NHL has never made any decision about the relocation of the Phoenix Coyotes to any site, be it Ontario, Canada or anywhere else, i.e., the NHL has not yet applied its relocation requirements to this request.

The court notes that in some of the bona fide dispute cases cited by the parties, some courts found a bona fide dispute existed even though no law suit had been filed, those conclusions were reached very early in those cases, and occasionally with a very brief record. However, such cases almost universally involved claims of secured creditors where it was virtually obvious that the claimed lien was unperfected or voidable under the Code; a few cases involved tax assessments which had been contested by the debtor. Here the bona fide dispute claim is predicated upon antitrust claims. As noted above, antitrust claims are inherently factually driven cases and it is not an antitrust violation for professional sports leagues to have terms and conditions on relocations of member teams. The Ninth Circuit and other Circuit courts have repeatedly stated that particularly where such claims involve professional sports leagues such claims are very factual driven. Simply put, more is needed here for the Debtors and PSE to establish that there are "bona fide disputes" regarding the interests of the NHL and the claim by the Phoenix Coyotes that it can be sold free and clear of the NHL interests.

■ The Debtors and PSE also assert that the NHL should have to make a decision on the request to relocate in time to meet the June 29th deadline. There is certainly appeal to that assertion by getting the creditors paid now. PSE, and possibly the Debtors, set the June 29th deadline with, the court assumes, good intentions. However, it is beyond dispute that the Stanley Cup playoffs are occurring at the same time as this case. Commissioner Bettman literally left the June 9th hearing in Phoenix in the afternoon so he could be present at game six of the finals in Pittsburgh, Pa. that evening. The court assumes that this is one of the more important time periods of the year for the NHL and its members. From this record, the court infers that relocation applications create significant issues that mandate careful consideration by all effected parties; the very antitrust cases cited by the Debtors and PSE virtually compels such conclusion. On this record, this court is unconvinced that it should order that the NHL must decide the relocation application to meet the June 29th deadline.

■ Lastly and for all of the reasons set forth above, on this record the court can not find that antitrust law, as applicable nonbankruptcy law, permits the sale free and clear of the relocation rights of the NHL.

## C. The Arena, Glendale and the Best Interests of Creditors

As all parties appear to recognize, the Motion was also effectively a request to reject the Arena Agreement with Glendale. Such effective request and the issues related thereto raise difficult and troubling issues for all. Initially the court is troubled that no rejection motion was filed and served. Given that everyone agrees that rejection will cause significant harm to Glendale, rejection should have been expressly requested by motion.

■ Glendale asserts that its specific performance claim and right is not subject

to the sale free and clear powers under Section 363 and is also not subject to rejection as a matter of law. The Debtors and PSE dispute Glendale's assertions on both points. The case law regarding the extent to which specific performance claims can survive rejection is not clear. *See Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985); *Matter of Udell,* 18 F.3d 403 (7th Cir.1994); *In re Ward,* 194 B.R. 703, 714 (Bankr.D.Mass.1996) ["... the decisions are in disarray"]. Glendale further asserts that the harm to it if the Phoenix Coyotes are allowed to leave and play its home games elsewhere is far greater than, in its view, the minor benefit to the creditors. There is case law supporting Glendale's legal assertion. It is proper for the court to refuse to authorize rejection of an executory contract where the party whose contract is to be rejected would be damaged disproportionately to any benefit to be derived by the general creditors of the estate. *See In re Pomona Valley Medical Group, Inc.,* 476 F.3d 665 (9th Cir.2007); *In re Chi–Feng Huang,* 23 B.R. 798 (9th Cir.BAP1982). The challenge is in determining the apportionment of the respective damage and benefit. In that regard, the court notes that Glendale has gone to great lengths to show the damage to it from rejection but essentially makes a minimal showing regarding the other side of the equation, i.e., the benefit to the general creditors. In that regard, the court notes that this information was requested by the court in advance of that hearing and, to be blunt, all the materials provided were not particularly helpful.[5] Here it appears that the proposed sale to PSE might, and very conceivably would, provide a significant payment to the general creditors.

An additional factor is the Debtors' assertion that virtually all of Glendale's bankruptcy claim would be capped/limited under Section 502(b)(6). *See In re El Toro Materials Company, Inc.,* 504 F.3d 978 (9th Cir.2007). Assuming the Debtors are correct, the capping of Glendale's claim results in an even large recovery for the general creditors, i.e, hence a greater benefit for the general creditors.

■ Although the Debtors' business judgment on assumption or rejection is entitled to some deference, that does not mean the court does not analyze the best interests of creditors. Notably the creditors appear fairly evenly divided. The NHL, Glendale and Aramark opposed the Motion. The OUCC and Moyes support the motion. Interestingly, how their views should be considered by the court may depend on whether it is a one vote per creditor outcome or the outcome is based upon the dollar amount of the claims. Regardless, maximizing the recovery for all of the creditors is the paramount concern of the court; of course, all of this assumes the Debtors can ultimately prevail by meeting their burden on all issues related to the Motion. The principal reason the Motion has been so carefully considered by the court is that it appears that the sale proceeds would most likely provide a material return to the general creditors. However, although that is always a significant consideration for this court, such outcome does not lessen the requirements under the Code before the court can authorize the sale of estate property and/or the assumption and assignment of executory contracts.

Because the court is not granting the Motion, it need not now decide whether (1)

---

**5.** The primary difficulty was the material variance in the assumed amounts due or paid to the various creditor(s).

the proposed sale can be approved free and clear of Glendale's claimed specific performance right, (2) the best interests of creditors has been established, or (3) the apportionment of the damages to Glendale outweigh the apparent benefit to the general creditors.

### D. The Concerns of the Professional Sports Leagues

The major professional sports leagues have urged this court not to invalidate their contractual rights or to allow the Code to be used to void the leagues' rights to control (1) who may become a member of their respective leagues and (2) where their members can be located to play their home games. Their main expressed concern is that such outcome would "encourage financially challenged franchises to enlist the aid of the bankruptcy courts in an effort to circumvent established league rules". As hopefully reflected by this decision, financially challenged sports team have the same rights and obligations as any business that becomes a debtor in the bankruptcy court. The rule of law will decide, as it has in the antitrust cases, if any league rules are unenforceable or whether the rights and powers under the Code render some of those rules unenforceable.

As the court noted at the hearing, it struggles with the assertion that granting the Motion would "wreak havoc" on professional sports. From the outside looking in, it appears that each of the leagues has not suffered or been materially damaged when one of its member made a quick and unapproved move as the then Baltimore Colts and San Die go Clippers did in 1984 and the Seattle Pilots did in 1970 [ultimately the American League consented to this move].

### E. The APA's June 29th Deadline

Considering the effect of the conclusions set forth above, the court does not think that the unresolved issues can be resolved, assuming that they can be favorably resolved by the Debtors and PSE, prior to the June 29th deadline. Simply put, the court does not think there is sufficient time (14 days) for all of these issues to be fairly presented to the court given that deadline. In making that statement, the court recognizes the diligent efforts and hard work by all parties and their attorneys, including all attorneys' professionalism under trying circumstances, in presenting their respective positions to the court regarding the Motion. Thus the Motion is denied, without prejudice. Accordingly, the June 22nd auction date and other deadlines related thereto are vacated.

Counsel for the NHL shall serve and lodge a BRIEF form of order denying the Motion, without prejudice.